**UNITED STATES of America,**
**Plaintiff,**

v.

**William C. BRICKEY, Jr., Defendant.**

**No. LR–68–CR–82.**

United States District Court
E. D. Arkansas, W. D.

Feb. 20, 1969.

W. H. Dillahunty, U. S. Atty., and William F. Sherman, Asst. U. S. Atty., Eastern District of Arkansas, Little Rock, Ark., for plaintiff.

H. Clay Robinson, Little Rock, Ark., for defendant.

Memorandum Opinion

HENLEY, Chief Judge.

The indictment in this criminal case charges that between September 1963 and March 1967 the defendant, William C. Brickey, Jr., violated the federal Mail Fraud Statute, 18 U.S.C.A. § 1341,[1] by knowingly causing mail matter, identified in the respective counts, twenty-four in number, to be delivered by the Post Office Department allegedly for the purpose of executing a scheme or artifice to defraud Republic Casualty Company, its minority stockholders, general creditors, and policy holders.

In due course, the defendant, represented by counsel of his own choice, pleaded not guilty to the indictment but reserved the right to attack the indictment by appropriate motion. Thereafter, defendant filed a motion to dismiss all of the counts of the indictment or, in the alternative, for a bill of particulars. Memorandum briefs in support of and in opposition to the motion were filed by respective counsel.

In support of the motion counsel for the defendant argued that the indictment showed on its face that the mailings described in the respective counts were routine, legitimate business mailings of the concerns and individuals involved, that they did not involve the use of the mails for the purpose of executing any fraudulent scheme concocted by the de-

---

1. Insofar as here pertinent the statute provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department * * * or knowingly causes to be delivered by mail according to the direction thereon * * * any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

fendant, and that the deliveries of the several items of mail matter did not constitute violations of the statute. Heavy reliance was placed on Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277.

On November 15, 1968, the Court refused to dismiss the indictment as a whole and specifically refused to dismiss Counts I and II and Counts XIX–XXIV. The Court ordered a bill of particulars to be filed, and reserved ruling on Counts III–XVIII until the bill had been filed and considered.

After the bill was filed, the defendant renewed his motion to dismiss all of the counts. On December 31, 1968, the Court not without some hesitation as to all counts, except I and II, overruled the renewed motion in its entirety, reserving the right, however, to "reconsider the contentions of the defendant should they be renewed by appropriate post-trial motion should the defendant be convicted."

On February 5 and 6, 1969, a pre-trial conference in the case was held in open court. Prior to the holding of the conference the Court had felt its doubts as to the validity of Counts III–XXIV return strongly and on its own motion reconsidered the questions raised by the defendant, restudied the briefs, and engaged in some independent research of its own. In the course of the conference counsel were advised that the Court was reconsidering the validity of the counts just mentioned and invited oral argument.

Rather extensive argument was heard in chambers and at its conclusion the Court announced that it would make its ruling the following day and would subsequently file a memorandum opinion stating the reasons for the action taken.

On February 7 an order was entered dismissing all counts, except Count I and Count II; this memorandum will express the Court's thinking as to the dismissed counts. The Court is indebted to counsel for a full presentation which has been most helpful.

During the indictment period Republic Casualty Company, hereinafter Republic, was an Arkansas casualty insurance company which prior to the beginning of the period and down to the demise of the company in 1967 was engaged in the business of selling automobile insurance. Republic did not sell its own policies directly to insureds; rather, the policies were sold by a number of independent insurance agencies in Arkansas. Many, perhaps most, of Republic's policy holders were service men, and many, perhaps most, of them applied for and received their policies by mail from the independent agencies and paid their premiums by mail. They seem to have had no direct dealings with Republic, except in connection with claims. There is no question that in its day to day operations Republic used the mails in many ways, as does any operating insurance company.

Republic was required to file from time to time with the Arkansas State Insurance Department financial statements and reports. Those reports indicated that the company was sound and solvent and was possessed of sufficient assets and reserves to pay all claims that might be made against it.

At some time in 1967 the Insurance Department discovered that Republic was in fact insolvent, and its affairs were taken over by the Insurance Commissioner. Such a failure of a casualty insurance company almost invariably causes policy holders, general creditors, and stockholders to sustain losses, and it is inferable that those classes of persons have sustained losses as a result of Republic's insolvency. In any event, the Government so contends.

After the insolvency of Republic was discovered, its operations were investigated by the United States Post Office Department, and this prosecution resulted from that investigation.

Broadly stated, the theory of the Government is that in the fall of 1963 the defendant, Brickey, acquired control of Republic and became its president and general manager, and that he was in full control of the operations of the busi-

ness; that Brickey decided to loot the company and did so; that in so doing Brickey well knew that he was bringing his company to financial wreck, and that he would damage not only the corporate entity but also his fellow stockholders, policy holders, and general creditors of the company. The Government contends that Brickey's operations amounted to a scheme and artifice to defraud the corporation and the classes of persons that have been mentioned, and that he caused the mails to be used for the purpose of executing the alleged scheme and device.

The alleged scheme is set forth in considerable detail in the first count of the indictment, incorporated by reference into the remaining counts, and in the bill of particulars. It is charged that the scheme had several aspects. It involved in part direct diversions of corporate funds and assets from the corporation to Brickey himself and to members of his family; it also involved diversions of corporate funds and assets to another Brickey controlled entity known as General Leasing Corporation; it further involved Brickey acquiring for himself with Republic funds a Nebraska fire insurance company which is now defunct; and it finally involved his personal acquisition of a hotel in Texas, paying therefor in large measure with binding obligations of Republic which he caused Republic to issue. It is further charged that as a part of the scheme Brickey would cause Republic to file false statements and reports with the State Insurance Department, which was allegedly done.

Each of the counts of the indictment charges a specific unlawful mail use, specifically that in each instance Brickey knowingly caused a certain piece of mail matter to be delivered by the Post Office Department to the addressee according to the direction thereon.

The Court has no trouble with Counts I and II since both of those counts charge mailings directly related to parts of the alleged scheme set out in Count I.

Count I charges that in January 1965 the defendant knowingly and willfully caused to be delivered by mail to the Worthen Bank & Trust Co. in Little Rock, Arkansas, a $75,000 check drawn on Republic and made payable to Brickey himself; the check was mailed to Little Rock from Chicago, Illinois. The bill of particulars sufficiently relates that check to the part of the alleged scheme whereby Brickey was to use Republic funds to secure personal control of the Nebraska insurance company.

Count II charges that in March 1965 the defendant knowingly and willfully caused to be delivered by mail to the Worthen Bank & Trust Co. in Little Rock, Arkansas, a $35,000 check drawn on Republic and made payable to Leonhart & Co., Inc. That check seems to have been mailed from Baltimore, Maryland. The bill of particulars relates that check to the part of the alleged scheme whereby Brickey would directly divert Republic funds to his own use; the bill alleges that Brickey owed Leonhart & Co., Inc., $35,000 and used the $35,000 check mentioned in Count II to pay the debt.

■ But, the remaining counts of the indictment are not related to the "parts" of the scheme set out in Count I. Some of the remaining counts charge violations based on routine mailings to and from Republic, and the others relate to mail transactions involving the independent agencies, not alleged to have been parties to the scheme, and individual service men insureds. Some of the latter mailings passed from the agencies to the insureds, and others passed from the insureds to the agencies.

Count III, for example, charges that Brickey illegally caused to be delivered by mail to an individual policy holder a Republic claim form. It appears that the policy holder had a loss and desired to file a claim, and that Republic supplied him with a form. Another example is to be found in Count IV which charges that Brickey illegally caused to be delivered by mail to Flint Construction Co. of North Little Rock a Republic policy sold by one of the agencies and mailed by that agency to the insured.

## I.

As noted, under section 1341 a person violates the law if, after having devised a fraudulent scheme, he knowingly causes mail matter to be delivered by the Post Office Department "for the purpose of executing such scheme" or "attempting to do so."

In Atkinson v. United States, 8 Cir., 344 F.2d 97, 98, the Court said that the gist of the offense described in the statute is "the causing of the insertion in the mail of matter intended to be used to effect the scheme to defraud."

■ While the statute is to be construed reasonably and sufficiently broadly to cover the conduct which it was designed to prohibit, it must be kept in mind that the statute is a criminal statute. Further, the statute was not designed to reach all frauds "but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." Kann v. United States, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88; see also Parr v. United States, supra.

■ Specifically, the statute does not cover a mere conversion or misapplication of corporate funds by a corporate officer or employee merely because the mails are used in the corporation's business or because the funds diverted have been received by the corporation through the mails. Parr v. United States, supra; United States v. Beall, N.D.Cal., 126 F.Supp. 363.

## II.

■ In order to establish a violation of section 1341 the indictment must allege and the Government must prove the following essential elements:

1. A scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

2. A use of the mails "for the purpose of executing" the scheme.

3. A culpable participation in that use by the defendant either by making the use himself or by knowingly causing someone else to make the use.

■ Where an indictment fails to allege the existence of all of those elements, or where the facts alleged in the indictment negative the existence of one or more essential elements of the offense, the indictment cannot stand. Bauman v. United States, 5 Cir., 156 F. 2d 534; United States v. Beall, supra.

■ Given a fraudulent scheme, determination of whether a particular use of the mails has violated the statute involves a two-fold inquiry. First, was there a sufficient connection between the use of the mails and the scheme? Second, if so, was there a sufficient connection between the mail use and the defendant? In answering both of those questions regard must be had to the nature, objectives, and intended victims of the scheme itself.

■ In mail fraud context the material mailed may be fraudulent in itself, as where the defendant induces the victim to part with his money by means of false representations sent through the mail; or the defendant may receive the fruits of the fraud by mail. It is not necessary, however, that the material be fraudulent in itself; even if the material sent or delivered by mail is innocuous, the mailing or delivery is prohibited if done or brought about for the purpose of executing a fraudulent scheme. Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706. It is not necessary that the scheme contemplate the use of the mails as an essential element, although of course it may and frequently does affirmatively contemplate a mail use.[2] It is enough if

2. Some fraudulent schemes such as check "kiting" or credit card frauds could not be conducted successfully apart from mail

use which the offender expects to take place and upon which he relies for delay in discovery or for an opportunity to

the mail use is "incident to an essential part of the scheme." Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435.

■ It is sometimes said that the mail use must be "in execution" of the scheme, see Adams v. United States, 5 Cir., 312 F.2d 137. And it is frequently said that the use is sufficient if it is "in furtherance of" the scheme. Anderson v. United States, 8 Cir., 369 F.2d 11, 15; Atkinson v. United States, supra; United States v. Sorce, 4 Cir., 308 F.2d 299, 301. In Adams v. United States, supra, 312 F.2d at 140, the Court stated that the question is whether the mail use is "significantly related to those operative facts making the fraud possible or constituting the fraud."

■ Regardless of the particular language that a particular court may use in describing the necessary connection between the fraud and the use of the mails, it seems clear in the context of a criminal prosecution that the connection must be real and proximate, not merely abstract or remote. "The adequate degree of relationship between a mailing which occurs during the life of a scheme and the scheme is of course not a matter susceptible of geometric determination." Frankfurter, dissenting in Parr v. United States, supra, 363 U.S. at 397, 80 S.Ct. at 1187. In a given case the sufficiency of the connection should be determined "as a matter of practical good sense by which law determines such issues of causation" and finds some mail uses to be "too remote from the scheme to be deemed in execution of it." Ibid., 363 U.S. at 398, 80 S.Ct. at 1187.

■ As to the relationship between the defendant and the use of the mail, it is settled that it need not be established that he personally sent anything or received anything through the mail, nor need it be shown that he intended subjectively that the mails be used by anyone. In the leading case of

Pereira v. United States, supra, 347 U.S. at 8–9, 74 S.Ct. 358, the Court held that one "causes" the mails to be used if he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen. See also Anderson v. United States, supra; Atkinson v. United States, supra; United States v. Sorce, supra. Again, however, the Court thinks that the connection between the acts of the defendant and the use of the mails by someone else must be proximate and not remote.

The Court's ultimate conclusion in this case, to be developed presently, is that the mail uses charged in the twenty-two counts which have been stricken down were merely penumbral to the alleged scheme and do not amount to violations of section 1341. Otherwise stated, the Court has concluded that the connection between the scheme and the mail uses and the connection between the defendant and the mail uses were both too remote to sustain convictions under the counts which have been dismissed.

### III.

There is nothing novel in a legitimate business corporation being looted and ruined by a dishonest corporate officer in charge of the affairs of the corporation, and it is not unusual for the conduct of such an officer to cause loss to persons other than the corporation. Indeed, all "losses" sustained by defrauded corporations fall ultimately upon persons and entities other than the direct corporate victims of the frauds.

Nor is it unusual for a corrupt corporate officer to violate the mail fraud statute in the furtherance of his fraudulent designs. He may use the mails as a means of extracting money from the corporation, or to conceal his peculations, or to induce others to invest in the business, or to lend it money or extend it credit all to their ultimate loss.

---

perpetrate further frauds. See e.g. Adams v. United States, 5 Cir., 312 F.2d 137; Stevens v. United States, 8 Cir.,

227 F.2d 5; Deschenes v. United States, 10 Cir., 224 F.2d 688, 690.

But, in such a case the mail use charged against the officer is generally a criminal use in itself or is directly related to the execution of the raid upon the corporate coffers. Ordinarily, charges of violations of section 1341 will not be predicated upon innocent corporate mailings in the ordinary course of the day to day business of the corporation, or upon legitimate and routine mailings of other business entities acting as outlets for the defrauded corporation's goods or services.

It is just such mailings, however, that the Government charged in Counts III–XXIV to have been violations of the law. Not one of those mail uses was fraudulent in itself or had any proximate connection with Brickey's diversions of corporate funds. Brickey personally had nothing whatever to do with the mailings passing between the independent agencies and the insureds, and he had nothing personal to do with most of the mailings emanating from the offices of Republic.

In resisting the motion counsel for the Government argued that Brickey's alleged scheme went far beyond his corporation; that actually he was deliberately and fraudulently continuing to operate a business known to him to be insolvent or about to become insolvent; that actually he was defrauding the individuals who were buying Republic insurance. Counsel insisted that Republic was but an instrument of the fraud and a conduit through which passed the funds which he was wrongfully obtaining from insureds. That theory of the scheme is expressed to some extent in the following indictment language appearing in the early part of Count I:

" * * * that the defendant represented to Republic Casualty Company's agents, insureds, policy holders, stockholders and the insurance commissioner of the State of Arkansas and others that Republic Casualty Company was a solvent insurance company when in truth and in fact the defendant well knew that by his scheme and artifice to defraud he was depleting the corporate assets of Republic Casualty Company for his own use and benefit; and as a result of such conduct and action by the defendant, the said Republic Casualty Company was adjudicated to be insolvent by the Circuit Court of Pulaski County, Arkansas and a receiver appointed in March of 1967 * * *."

Having so characterized the alleged scheme, the Government contended that any mail use involving or relating to Republic and its business, however routine or innocent on its face, was tainted with fraud and constituted a violation of the statute. The Court was not convinced.

Conceding that the continuation of the operation of an insurance company amounts, in a sense, to a continuing representation that it is solvent and can pay claims made against it under its policies, and conceding that a person who is defrauding an insurance company to the point of insolvency and collapse must know that policy holders and others will probably suffer loss, the Court thinks that the Government's argument proves too much in the context of a criminal prosecution for violations of a mail fraud statute. If the Government's argument is correct, then every mailing involving, directly or indirectly, any of Republic's business or affairs, regardless of the nature of the material mailed, regardless of who mailed it or received it, and regardless of the circumstances of the mail uses, amounted to a felony on the part of Brickey. The Court was simply not prepared to go that far.

To put the matter slightly differently, the mail matter described in the last twenty-two counts of the indictment did not amount to false and fraudulent representations to anyone, except in the very broad sense, which the Court was not able to accept, that any transaction carried out by Republic or by others in connection with its affairs amounted to

a false and fraudulent representation that Republic was sound and solvent.

■ The position of the Government may find some support in some of the language of reported cases if that language is considered without regard to the facts of those cases in comparison with the facts of this case. It is axiomatic, however, that the language of opinions should be read in the light of the facts of the cases which produced those opinions.

This Court has seen only one case which closely resembles this one from a factual standpoint, and in that case the position of the Government was not sustained. The case is Parr v. United States, supra.

In Parr the pertinent facts were that a notorious Texas politician, George Parr, and some of his cohorts controlled the affairs of the Benavides School District in Duval County. Parr's colleagues were members of the school board, and he was the president of the bank in which the District's funds were deposited. Parr and his associates devised and carried out a scheme to defraud the District of large sums of money; the actual defalcations did not involve any use of the mails. However, in the routine management of the District's affairs the school board was required by Texas law to mail out certain documents and notices to taxpayers, and many taxpayers made their remittances by mail. The receipts of the District from the taxpayers provided the flow of money which the defendants were converting to their own use. It was charged that those mail uses, legitimate in themselves, constituted violations of section 1341.

The defendants were convicted, and the convictions were affirmed by the Court of Appeals for the Fifth Circuit, 265 F.2d 894. The Supreme Court granted certiorari, and in a 6 to 3 decision reversed the judgment of the Court of Appeals.

The majority of the Court took the position that the "legally compelled" mailings mentioned in the indictment which were legitimate mailings, or at least were not shown to be otherwise, were not "for the purpose of executing" petitioners' scheme to defraud the District. It is not possible to tell whether the majority gave controlling importance to the fact that the District was required by Texas law to send out certain materials by mail or whether the same result would have been reached had the District sent out the notices and other documents by mail voluntarily and not under legal compulsion.

Counsel for the Government argued strenuously that Parr is distinguishable from this case on the basis that there the mailings in question were required by law whereas here there was no legal requirement that the mails be used, and counsel also sought to distinguish Parr on other grounds.

The Court agrees with counsel that the Parr case is distinguishable from this one and does not cite Parr as a ruling precedent here. Parr is important here, however, in that the facts resemble the facts in this case and in that the majority of the Court in Parr rejected a prosecution theory which comes quite close to the Government's theory in this case.

In point of fact the strongest support for the Government's theory here is to be found in the dissenting opinion of Mr. Justice Frankfurter in the Parr case. He rejected the idea that it was material that the District was compelled to use the mails, and argued that since the defendants were in full control of the financial affairs of the District and had determined to plunder it, the mail uses in question were in furtherance of the scheme and were in violation of federal law. He differentiated between a mere embezzlement of agency funds by a subordinate employee, cf. United States v. Beall, supra, and a scheme to defraud the agency devised by those in charge of its affairs. And he stated that that which permitted them to set the school tax

rates within statutory limits obliterated "the line (defendants) seek to draw between themselves and the entity it was their duty to serve," and that by "demanding and collecting what they intended to misappropriate they made the process of collection an inseparable element of their scheme." (p. 399 of 363 U.S., p. 1187 of 80 S.Ct.) While there is much to be said in favor of the view taken by Justice Frankfurter and the two other Justices who joined him in dissent, the fact remains that their views were not persuasive to a majority of the Court.

In Adams v. United States, supra, involving a credit card swindle, the Court distinguished *Parr* on the basis that in the case before it the inevitable use of the mails in carrying the scheme to fruition was one of the operative facts which made the fraud possible, whereas in *Parr* the fraud was made possible not by the use of the mails but by the fact that Mr. Parr and his associates controlled the affairs of the school district.

So here, although the use of the mails played a large part in the successful prosecution of Republic's business, nevertheless when the situation is viewed realistically, Brickey's alleged fraud was possible not because Republic was conducting a mail order business but because Brickey controlled the corporation, which was at least the immediate target of the alleged fraud.

The Court does not know at this stage, of course, whether the defendant devised a scheme or artifice to defraud anyone; the presumption as of now is that he did not do so. If he did, then his conduct was as "bad and brazen"[3] as that of George Parr. But bad and brazen misconduct does not necessarily involve violations of the criminal laws of the United States. If the defendant has violated the criminal laws of the State of Arkansas, the State courts have jurisdiction with respect to such violations; this Court does not.

---

3. From the concluding paragraph of the majority opinion in Parr, 363 U.S. at 393, 80 S.Ct. 1171.