**UNITED STATES of America**

v.

**Nat TARNOPOL, Appellant, Peter Garris, Irving Wiegan, Lee Shep, Carl Davis, Melvin Moore and Carmine De Noia.**

**Appeal of Peter GARRIS.**

**Appeal of Irving WIEGAN.**

**Appeal of Lee SHEP.**

**Nos. 76–1542 to 76–1545.**

United States Court of Appeals, Third Circuit.

Argued May 5, 1977.

Decided Aug. 9, 1977.

Rehearing Denied Oct. 13, 1977.

Alan J. Davis, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellant Tarnopol.

Solaman G. Lippman, Lippman & Hart, Washington, D. C., Irwin Mininberg, Rhodes, Galfond & Mininberg, Washington, D. C., for appellants Garris, Wiegan and Shep.

Maryanne T. Desmond, Asst. U. S. Atty., Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for appellee.

OPINION OF THE COURT

Before GIBBONS, MARIS and HUNTER, Circuit Judges.

MARIS, Circuit Judge.

The appellants, Nat Tarnopol, Peter Garris, Irving Wiegan and Lee Shep, appeal from their convictions of violations of the federal mail fraud statute, 18 U.S.C. § 1341 and of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and fraud against the United States in violation of 18 U.S.C. § 371.

The facts of the case as they appear from the evidence viewed in the light most favorable to the government may be briefly summarized. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Brunswick Record Corporation (herein "Brunswick"), a New York corporation with offices in New York City, New York and Chicago, Illinois, and Dakar Records, Inc. (herein "Dakar"), a Pennsylvania corporation also with offices in New York City and Chicago, from 1971 to 1975, the period relevant to the criminal charges against the appellants, were engaged in the business of producing, marketing and selling phonograph records featuring artists' renditions of "soul" and "ryhthm and blues" music. Columbia Record Productions (herein "Columbia") a division of CBS, Inc., at its record pressing plant and distribution center located in Pitman, New Jersey, manufactured records from original recordings produced by Brunswick and Dakar. Columbia shipped records thus manufactured to customers according to instructions received from Brunswick and Dakar.

Nat Tarnopol was president and controlling stockholder of Brunswick and sole stockholder of Dakar. Peter Garris was executive vice-president, sales manager and a stockholder of Brunswick. Irving Wiegan was secretary-treasurer of the two corporations and a stockholder of Brunswick. Lee Shep was production manager for the corporations in charge of placing and processing customers' orders with Columbia. Carl Davis, Melvin Moore and Carmine De Noia, also known as "Doc Wassel", were acquitted co-defendants of the appellants. Davis was a vice-president and stockholder of Brunswick in charge of operations at Brunswick's recording studio in Chicago. Moore was in charge of promoting Brunswick and Dakar recordings with distributors and disc jockeys. De Noia, although not employed by Brunswick or Dakar, allegedly used their facilities from time to time and was engaged in the sale of records including those produced by Brunswick and Dakar.

It was the government's contention that sales of over $350,000 worth of Brunswick and Dakar records were not recorded on the corporations' books, that the proceeds of the sales in the form of cash or merchandise were retained by the defendants or used to create a fund out of which improper payments were made to disc jockeys and program directors of radio stations to secure favored treatment of Brunswick and Dakar recordings, and that the transactions were used to defraud the United States by impeding the functions of the Internal Revenue Service, and to defraud artists, song writers and publishers to whom the corporations were obligated to pay royalties based on sales as well as radio stations and the listening public who were deprived of the honest services of the radio stations' employees. Three of the government's witnesses were Brunswick employees, Edward Hurley, an unindicted participant in the alleged criminal activities, who was employed by Brunswick to solicit sales from the military and the export market, and Martha Archie and Anita Campbell, Brunswick bookkeepers. Other government witnesses included recording artists under contract to Brunswick, representatives of record distributors and retailers, a disc jockey and program directors for radio stations located in Cleveland, Ohio and Chicago, Illinois.

Sales of Brunswick and Dakar records were processed as follows. Garris informed Shep of customers' orders for records. Shep directed Columbia, by telephone, to fill the orders. This Columbia did out of its stock of records. If the stock was depleted, Columbia manufactured the required quantity and made shipment directly to the customer. A shipping document known as a "packing slip" accompanied each shipment, Columbia retaining one copy of the shipping document and mailing a second copy to the

Brunswick offices in New York, attention of Shep, to confirm the fact of shipment. Wiegan, who opened the mail at Brunswick, channeled to Shep these confirmation slips, the Brunswick copies of the packing slips.

With the exception of sales made for cash or in exchange for merchandise, Shep, after noting on the slip the number, type and price of the records, passed it on to the billing department where Mrs. Archie entered the sale in the sales journal, posted it to the customer's card in the accounts receivable ledger which she maintained, and prepared an invoice for billing purposes. The sales for cash or merchandise were not recorded in these books.[1]

In the case of sales of records—usually at substantial discounts—for cash or merchandise,[2] where the buyer received delivery from Columbia, Shep retained the confirmation slips instead of transmitting them to the billing department, and the transactions were not recorded by Mrs. Archie. Some sales for cash were made out of a large stockpile of records kept in Tarnopol's New York office. These transactions were also unrecorded on the books kept by Mrs. Archie. Various other artifices were employed by the defendants and adjustments made to Brunswick's sales records to conceal the nature of the payments made for records received from Brunswick or to eliminate the purchaser's obligation appearing on the books.

When Cardinal Export Corporation demanded payment of the value of merchandise delivered to the defendants in excess of the value of the Brunswick records it had received, false invoices were prepared by a Brunswick employee purporting to have been sent to Brunswick by Cardinal Export Corporation for recording equipment never actually ordered or received by Brunswick and costing an amount equaling that owed

1. The appellants contend that the government's proof that certain sales were unrecorded on the corporations' books was deficient in that Mrs. Archie herself testified to the existence of a "general ledger" kept by Wiegan, which record book was not in evidence and which might have contained a record of such sales.

2. In exchange for Brunswick recordings, distributors and retailers of records who handled other products delivered to the defendants and those designated by them home entertainment systems, television sets, radios, stereo receivers and speakers, air conditioners and the like for the personal use of the recipients.

Cardinal Export Corporation. Cardinal Export was then paid out of Brunswick's funds.

Tarnopol arranged with Joseph Voynow, president and owner of Carol Distributing Company, to purchase a new Cadillac Eldorado automobile which Voynow had recently acquired. Payment by Brunswick for the car was reflected on Brunswick's books by a "correction" to Carol Distributing Company's account with Brunswick resulting in a credit to that company in the amount of the cost of the car.

Other instances of false documentation and false entries made in Brunswick's books to conceal payments received by the defendants for records furnished by Brunswick were letters falsely stating that a customer's orders for records had been cancelled and credits entered in the books of Brunswick for returned records which, in fact, had not been returned.

Although the amount of royalties owed by Brunswick and Dakar to artists, writers and publishers depended upon their total record sales, periodic statements of royalty obligations were prepared from the records kept by Mrs. Archie which did not include the cash sales and exchanges for merchandise described above. The government, however, did not offer evidence as to the amount of royalties actually owed with reference to the corporations' total sales and there was evidence that Brunswick's and Dakar's advances of royalties to artists in amounts ranging from $5,000 to $30,000 always exceeded the amounts shown to be due them on the periodic statements.

On June 25, 1975 a grand jury sitting in Newark, New Jersey returned an 86 count indictment against the appellants and their three subsequently acquitted codefendants. All were charged in Count 1 with a conspiracy having three criminal objects: (A) to defraud the United States, in violation of 18 U.S.C. § 371, by impeding the functions of the Internal Revenue Service in the ascertainment, assessment and collection of income taxes due and owing from Nat Tarnopol, Brunswick and Dakar; (B) to utilize the mails, in violation of 18 U.S.C. § 1341, to defraud and attempt to defraud: (1) artists, writers and publishers of royalties on records sold by Brunswick and Dakar, (2) radio stations and the listening public of the faithful services of disc jockeys, music and program directors and other radio station employees and (3) the Internal Revenue Service in the ascertainment, computation, assessment and collection of taxes; and (C) to utilize the wires, in violation of 18 U.S.C. § 1343, to defraud the same three groups referred to above under the mail fraud objective of the conspiracy.

Counts 2 to 8 charged Tarnopol with attempt to evade income taxes owed by him for the years 1971, 1972 and 1973 and owed by Brunswick and Dakar for the years 1972 and 1973 in violation of 26 U.S.C.A. § 7201 and in furtherance of the Count 1 conspiracy. Count 9 and Counts 13 to 49 charged the defendants with substantive violations of the wire fraud statute in violation of 18 U.S.C. §§ 1343 and 2, and Counts 10 to 12 and 50 to 86 charged them with substantive violations of the mail fraud statute in violation of 18 U.S.C. §§ 1341 and 2.

The seven counts charging Tarnopol with attempted income tax evasion were severed from the other counts and transferred for trial in the District Court for the Southern District of New York pursuant to 18 U.S.C. § 3237(b). During the course of the trial of the present case, which commenced January 13, 1976, all of the counts charging violations of the wire fraud statute, 18 U.S.C. § 1343, were dismissed on motion of the government and nine of the thirty-seven counts dealing with mail fraud violations, 18 U.S.C. § 1341, on motion of the defendants. Following the acquittal of Carmine De Noia at the close of the government's case, the counts charging De Noia with criminal acts were dismissed. A final redacted indictment containing 28 counts was submitted to the jury. The first count described the conspiracy charge against all the remaining defendants as it was set forth in the original indictment. Counts 2 to 28 charged the remaining defendants with substantive mail fraud violations.

The jury's verdict was rendered on February 26, 1976. Defendants Moore and Davis were acquitted on all counts. All of the appellants were pronounced guilty of the Count 1 conspiracy charge. In addition Tarnopol was found guilty on Counts 3 through 7, and 12 through 28; Garris on Counts 2, 4 through 7 and 12 through 28; Wiegan on Counts 2 through 7 and 12 through 28; and Shep on Counts 2 through 7 and 12 through 28. All four appellants were found not guilty on Counts 8 through 11. Tarnopol was found not guilty on Count 2 and Garris on Count 3. Tarnopol was sentenced to pay a fine of $10,000 for his conviction under Count 1. For each count under which he was convicted he was sentenced to serve a term of three years in prison, the sentences to run concurrently. Garris, Wiegan and Shep were each sentenced to pay a fine of $10,000 under Count 1 and to two years in prison for each count under which they were convicted, the prison sentences to run concurrently.

The appellants raise numerous issues on appeal involving challenges to the soundness of the indictment and the sufficiency of the evidence and allegations of errors in the district court's admission of evidence and instructions to the jury.

The appellants submit that the charge of conspiracy to defraud the United States by impeding the Internal Revenue Service in the assessment and collection of taxes essentially charges a conspiracy to commit a violation of the Internal Revenue Code of 1954 and should have been integrated with the substantive provisions of the Code and subjected to its limitations. They contend that the federal wire and mail fraud statutes are inapplicable to tax-related offenses governed by the provisions of the Code.

The appellants argue that their use of the mails did not constitute a violation of the federal mail fraud statute, 18 U.S.C. § 1341. They maintain that their receipt of shipping confirmations mailed in the ordinary course of business was too remote from the fraudulent schemes attributed to them to be regarded as "for the purpose of executing" the schemes as required by the statute.

They argue that their failure to record certain sales represented by the confirmations with the alleged purpose of defrauding the Internal Revenue Service and others was not dependent upon the mailings and that the mails played no part in bringing the alleged fraudulent schemes to fruition.

The appellants strongly urge that proof of incomplete or false record keeping absent evidence of failure to file a tax return or of the filing of a false or incomplete return or of any affirmative misrepresentation directed to the Internal Revenue Service was insufficient to support an inference that the appellants agreed or intended to impede the Internal Revenue Service. They maintain that proof was lacking of an agreement or intent to effect any of the three alleged objects of the mail and wire frauds since the evidence was inadequate to support an inference of intent to impede the functions of the Internal Revenue Service, there was no showing that those to whom royalties were owed did not receive the amounts owed them and evidence of small amounts of cash given to employees of radio stations was insufficient to demonstrate an intent to influence their selection of records to be played on the air.

The appellants contend that they were denied a fair trial by the district court's admission of nonprobative evidence of a highly prejudicial and inflammatory nature. They assert error in the district court's failure to instruct the jury to disregard a prejudicial uncorroborated statement in the prosecution's opening remarks. They maintain that the district court erred in instructing the jury as to the criteria for deciding whether certain transactions included in the prosecution's proof of a single conspiracy were separate and distinct from the over-all conspiracy. They contend that the court's instructions regarding the relevance of transactions, found to be independent, to prove the existence of an over-all conspiracy and the individual defendants' membership in it were erroneous under the principles set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), relating to the danger of transfer-

ence of guilt in cases involving multiple separate transactions and under the rule of evidence limiting the admissibility of proof of other crimes. The appellants further contend that, whereas the district court presented to the jury an extensive explanation of the prosecution's theories of guilt, the court failed to comment on crucial defense theories to the prejudice of the defendants.

Finally, the appellants submit that under *United States v. Dansker,* 537 F.2d 40 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), if evidence is insufficient to support a conviction of conspiracy with regard to any one of alleged multiple objects of the conspiracy, the conviction must be vacated where it is not known on which object of the conspiracy the jury based its verdict of guilty.

In considering these contentions we turn first to the question whether the use of the mails alleged and proved by the government constituted a violation of the mail fraud statute, 18 U.S.C. § 1341,[3] which makes punishable as a crime the use of the mails "for the purpose of executing" a scheme to defraud or attempting so to do. Thus the gist of the crime is the use of the mails for the purpose of executing a scheme to defraud. It is not every fraudulent scheme which is comprehended by the mail fraud statute but only those in which the mails are used. And it is not every use of the mails in connection with a scheme to defraud which the statute stamps as criminal but only those which are made for the purpose of executing the fraudulent scheme. As the Supreme Court said in *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944):

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."

In the light of recent decisions on the subject, the guidelines have become reasonably clear for determining whether a mailing is or is not to be deemed "for the purpose of executing" a scheme to defraud within the meaning of the mail fraud statute. *See United States v. Kenofskey,* 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917); *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). *See also United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974), *modified in banc on other grounds,* 517 F.2d 53, *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. Keane,* 522 F.2d 534 (7th Cir. 1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Adamo,* 534 F.2d 31 (3d Cir. 1976); *United States v. LaFerriere,* 546 F.2d 182 (5th Cir. 1977); *United States v. Britzman,* 547 F.2d 380 (7th Cir. 1977); *United States v. Kaplan,* 554 F.2d 958 (9th Cir. May 26, 1977); *United States v. Beall,* 126 F.Supp. 363 (N.D.Cal.1954); *United States v. Brickey,* 296 F.Supp. 742 (E.D.Ark.1969).

In each case the question is whether or not the "mailings were sufficiently closely related to respondent's scheme to bring

---

**3.** "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341.

his conduct within the statute." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Moreover, as the Court of Appeals for the Fifth Circuit said in *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977), "the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." Thus, mailings taking place after the object of the scheme has been accomplished, *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), or before its accomplishment has begun, *United States v. Beall*, 126 F.Supp. 363 (N.D.Cal.1954), are not sufficiently closely related to the scheme to support a mail fraud prosecution. Nor are routine mailings required by law which are themselves intrinsically innocent even though they take place during the course of carrying out a fraudulent scheme, the objective of which is the embezzlement of funds received in response to the mailings. *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). We do not believe that there is a valid distinction to be drawn between those routine mailings which are required by law and those routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise. In either case the mailings themselves are not sufficiently closely related to the fraudulent scheme to support a mail fraud prosecution even though securing the funds received through some of them is the object of the scheme to defraud, as was true in the *Parr* and *Beall* cases. *See United States v. Brickey*, 296 F.Supp. 742, 748–749 (E.D.Ark.1969). A *fortiori* if the documents received in the mailings are used by the perpetrators of the scheme merely as a convenient but not essential tool in carrying out that object, as in the case before us.

■ It remains to apply these principles to the present case. The mailings here relied upon by the government in support of the substantive counts were the packing slips mailed by Columbia to Brunswick and Dakar listing the records shipped out by Columbia to the customers of Brunswick and Dakar at the direction of the latter. This was a routine business procedure which was uniformly followed in the case of all sales, whether or not they were involved in the scheme to defraud. The procedure was itself intrinsically devoid of any element of fraud and, indeed, it or its equivalent would appear to have been necessary in the conduct of legitimate business by Brunswick and Dakar with Columbia. No distinction was made in this practice between sales subsequently entered on the books and those which became involved in the scheme to defraud. It was only after the packing slips were received by Wiegan and by him turned over to Shep that they were used by the latter as a convenient means of distinguishing those sales to be placed on the books from those to be included in the fraudulent scheme.

The government contends that the appellants' fraudulent scheme began with the sale of records and, therefore, included the receipt of the packing slips. The government's theory is that but for the sale there would have been no failure to enter the sale on the books and, thus, no fraud. This argument, however, merely points out the link between the sales, the mailings and the fraud but does not address the crucial question whether the packing slips were received for the purpose of executing the scheme to defraud. *See United States v. Staszcuk*, 502 F.2d 875, 881 (7th Cir. 1974), *modified in banc on other grounds*, 517 F.2d 53, *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

The government further contends that the appellants relied upon the packing slips to perpetrate the fraud since receipt of the slips indicated to them that shipment had occurred and that the fraudulent treatment of the sale involving that shipment could, therefore, commence. The government argues, also, that the slips kept by Shep in his desk enabled the appellants to ascertain how much cash was owed to them and to keep track of the names and numbers of the large quantities of records sold in unrecord-

ed transactions. We see no merit in these contentions. If the execution of the fraudulent scheme with respect to a particular shipment did not commence until after the packing slips had been received, the mailing was too remote to be in furtherance of the scheme. And the use of the packing slips to keep track of sales, shipments and moneys due was clearly a legitimate business use wholly unrelated to the fraud. Moreover, we think that the use of the packing slips, which necessarily involved the receipt by the purchasers of the original slips and Columbia's retention of copies of them, tended to threaten the success of the fraudulent scheme rather than to further it. For it was important to the success of the scheme that the unrecorded sales for cash or merchandise be concealed. Indeed, it would appear that the fraud would have been better served if no packing slips had been in existence. *See United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. Staszcuk*, 502 F.2d 875, 880 (7th Cir. 1974), *modified in banc on other grounds*, 517 F.2d 53, *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977).

The government argues, finally, that the packing slips were received for the purpose of executing the fraud in that the mailing and receipt of them for all shipments made by Columbia, without exception, created an appearance of propriety and thus aided in the fraudulent scheme, which involved a series of fraudulent transactions over a long period of time. We see no merit in this argument. These mailings were initiated by Columbia, not by the appellants, and they represented a perfectly proper routine procedure in aid of the conduct of business between Columbia and Brunswick and Dakar. Being intrinsically legitimate and, indeed, necessary they did not create a false facade in themselves and the government's proof is otherwise insufficient to establish that they aided in the continuance of the fraud. *See Parr v. United States*, 363 U.S. 370, 391–392, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *United States v. Brickey*, 296 F.Supp. 742, 749–750 (E.D.Ark.1969).

We conclude that these mailings did not qualify as mailings made for the purpose of executing the scheme to defraud alleged in the indictment. They were, as we have seen, routine mailings, which although taking place during the conduct of the over-all scheme to defraud, were too remote from it to be regarded as furthering it. They served the legitimate and, indeed, necessary business purpose of informing Brunswick and Dakar of the fact that shipments of records had been made by Columbia directly to their customers. Moreover, in each case relied on by the government in support of the substantive counts the mailing, as we have pointed out, took place before the first action was taken to execute the fraud. For this took place when Shep decided to retain the packing slip in his desk instead of turning it over to Mrs. Archie for entry in the sales journal and accounts receivable ledger. We are compelled to conclude that the convictions of the appellants upon the several substantive counts all of which were based upon these mailings cannot stand.

The conspiracy count of the indictment, however, included broader charges of mail fraud as well as charges of wire fraud and of defrauding the United States by impeding, impairing and obstructing the functions of the Internal Revenue Service. Since all the appellants were convicted on this count also, it requires further discussion.

The conspiracy count, as we have seen, alleged that the conspiracy had three objectives, (1) to defraud the United States in violation of 18 U.S.C. § 371 by impeding the functions of the Internal Revenue Service, (2) to use the mails, in violation of 18 U.S.C. § 1341, to defraud (a) artists, writers and publishers, (b) radio stations and the listening public, and (c) the Internal Revenue Service, and (3) to use the wires, in violation of 18 U.S.C. § 1343, to defraud the same three groups. The jury rendered a general verdict of guilty on the conspiracy count under instructions by the trial judge that the defendants could be found guilty on this count if the jury found that the defendants had engaged in any one or more

of the illegal activities alleged in the count as objectives of the conspiracy. Under these circumstances, it is impossible to determine whether or not the jury based its verdict upon less than all three of these activities and, if so, upon which ones the verdict was founded. In this situation, the verdict of guilty on Count 1 cannot stand if the indictment was insufficient in law in that any one of the three objectives of the conspiracy did not constitute a crime or if the evidence was insufficient to sustain a finding by the jury that any one of these activities had been engaged in. *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). To this question, therefore, we now turn.

■ The first objective of the conspiracy alleged in Count 1 is to "Defraud the United States by impeding, impairing, obstructing and defrauding the lawful governmental functions of the Internal Revenue Service . . . in the ascertainment, computation, assessment and collection of income taxes due and owing and to be due and owing from" Tarnopol, Brunswick and Dakar in violation of 18 U.S.C. § 371. The appellants urge that 18 U.S.C. § 371, which proscribes in general terms conspiracies to defraud the United States has been superseded with respect to conspiracies involving violations of the internal revenue laws by the penal provisions of the Internal Revenue Code, which, as the Supreme Court pointed out in *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943), comprehensively cover every duty under the income tax law and provide a penalty suitable to every degree of delinquency. However this may be, and there is support for the appellants' position, *United States v. Henderson*, 386 F.Supp. 1048, 1053–1054 (S.D.N.Y.1974), we are satisfied, in any event, that the government's evidence was insufficient to support a finding that the appellants did in fact wilfully impede or obstruct the Internal Revenue Service in the ascertainment, assessment and collection of income taxes due and owing from Tarnopol, Brunswick and Dakar. The trial judge properly instructed the jury that merely omitting transactions from the corporate books was in itself insufficient to establish a crime. The jury, he told them, must go further and find that this was done with an intent to impede and obstruct the functions of the Internal Revenue Service in the manner charged. This was as the indictment alleged, with respect to the income tax liability of Tarnopol, Brunswick and Dakar.

We think that in submitting to the jury on the evidence in this case the question of criminal intent to defraud the United States the trial judge erred. For our examination of the entire transcript of testimony fails to disclose any evidence, other than the mere fact that numerous sales were not entered in the books, upon which a finding of such intent could be based. And this, as the trial judge properly told the jury, was not enough without more to establish a crime. There was no evidence that Brunswick, Dakar or Tarnopol filed inaccurate income tax returns or omitted gross income therefrom for the years involved; that they evaded income taxes for those years; or that an Internal Revenue Service examination or audit was pending, expected or contemplated by the defendants. Moreover, there was no evidence, oral or documentary, which established or hinted at the evading or avoiding of the tax liability of Tarnopol, Brunswick or Dakar or which even mentioned the subject of tax liability, let alone any misrepresentation to the Internal Revenue Service or any of its agents.

It thus appears that the finding of conspiracy to defraud the United States by impeding the functions of the Internal Revenue Service rests at bottom solely on the failure to record certain sales for cash or merchandise on the sales journal and accounts receivable ledger or to falsify those records. We are clear, as was the trial judge, that this was not enough. In *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), *cert. denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958), which involved a similar charge of conspiracy to defraud the United States and in which there was evidence, *inter alia*, of false returns and false

statements to treasury officials, the Court of Appeals for the Second Circuit, while affirming the defendants' conviction, took occasion to say (p. 916):

> "Mere failure to disclose income would not be sufficient to show the crime charged of defrauding the United States under 18 U.S.C. § 371."

It follows that there was a failure of proof with respect to this particular alleged objective of the conspiracy. Accordingly, since we cannot know whether or not the jury based its verdict upon this objective alone, the verdict of guilty on Count 1 cannot stand. *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The question remains, however, whether the judgment entered on it should be reversed or whether it must be vacated and the case remanded for further proceedings on Count 1. This in turn depends on whether the evidence offered by the government was sufficient to support a verdict of guilty on that count based on either the mail fraud or the wire fraud allegations or both.

In the case of both the mail fraud and wire fraud allegations of the conspiracy count the objectives alleged were (1) to defraud artists, writers and publishers of royalties, (2) to defraud radio stations and the listening public of the loyal services of disc jockeys and other employees by making secret payments to them to broadcast Brunswick and Dakar records, and (3) to defraud the Internal Revenue Service in the ascertainment, computation, assessment and collection of income taxes. As we have already indicated, the evidence was insufficient to establish the alleged fraud with respect to the Internal Revenue Service. An examination of the record satisfies us, however, that there was evidence from which a jury could find that artists were defrauded of royalties. The statements of royalties furnished to them were taken from the books kept by Mrs. Archie which admittedly did not show cash and merchandise sales in large amounts. Accordingly, a jury would be justified. in finding that fraudulent statements of royalties largely understating the amounts due were given to the artists. The evidence relied upon by the appellants that the latter received large advances of royalties which offset the amounts due need not necessarily negate such a finding. For an advance is by definition a payment of funds before its equivalent has been received and it creates the relationship of debtor and creditor. Thus a jury might well find that calling a payment an advance of royalties when the amount paid represented royalties actually due and owing was a means of defrauding the artists of the royalties actually due them. With respect to the allegations of defrauding radio stations and the public of the loyal services of disc jockeys and others through secret payments we note that there was evidence of such payments having been made. Here again a jury would be entitled to find from this evidence that such fraudulent activities took place.

It remains to determine whether there was evidence of mailings and wire communications in connection with these two objectives of the conspiracy, respectively, which could be found to be within the contemplation of the mail fraud and wire fraud statutes. Since each of the statutes limits the relevant use of the mails or the wires, as the case may be, to use "for the purpose of executing" the scheme to defraud they are in this regard *in pari materia* and are, therefore, to be given similar construction. *See* e. g., *United States v. Holmes*, 390 F.Supp. 1077 (W.D.Mo.1975); *United States v. Pollack*, 175 U.S.App.D.C. 227, 534 F.2d 964, 971, *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). Accordingly, the cases construing the mail fraud statute are applicable to the wire fraud statute as well. Therefore, wire communications are to be considered within the statute only if they would have been so considered had they been mailings. It is true, of course, that under the wire fraud statute only the interstate use of the wires is proscribed. With these principles in mind we consider whether there was among the overt acts alleged in the indictment and disclosed by the evidence any use of the mails or wires

or both which a jury might find was for the purpose of executing the two remaining objectives of the alleged fraudulent scheme within the meaning of the statutes.

Among the overt acts charged in the conspiracy count are the mailings of packing slips from Columbia to Brunswick and Dakar. These, however, as we have seen, were too remote from the scheme to defraud to be regarded as furthering it and we have so held with respect to the substantive counts. But the conspiracy count, as contrasted with the substantive counts, alleges other uses of the mails which we think could be found to have been made for the purpose of executing the scheme to defraud within the meaning of the statute. Without attempting to be exhaustive, since that is not necessary for our present purpose, we note one such instance. Overt act No. 37 charged that defendant Garris on or about October 27, 1972 received from a record merchandiser in Los Angeles personal money orders totaling $1,075.00 as payment for musical recordings. In support of this allegation, the testimony of Biliouris, president of Show Industries, Inc., of Los Angeles, was that he arranged to purchase Brunswick records at a discount directly from Garris. He further testified that six bank money orders, admitted in evidence, dated October 27, 1972 and totaling $1,075.00 were mailed by him to Garris in payment for the records. A jury could undoubtedly find that this use of the mails to forward the proceeds of a cash sale to an individual defendant was for the purpose of executing the alleged scheme to defraud.

A number of the overt acts alleged in Count 1 involve the use of the wires. Among these we need refer only to overt acts Nos. 29 to 36. Each of these alleged that defendant Garris on various dates in 1971, 1972 and 1973 received Western Union telegraphic money orders in various amounts from a record merchandiser in Los Angeles as payment for musical recordings. The testimony of Biliouris, president of Show Industries, Inc. in Los Angeles, indicated that he sent Western Union telegraphic money orders to Garris on the dates and in the amounts alleged in the indict-

ment as payment for Brunswick records pursuant to an arrangement arrived at with Garris in 1971. The money orders were sent to Garris' home at his request. Receipts for the money orders were admitted in evidence. From this evidence it is clear that a jury could find that this use of the wires was for the purpose of executing the alleged scheme to defraud.

As we have seen, Count 1 of the indictment charged use of both the mails and the wires for the purpose of executing the alleged scheme to defraud (1) artists, writers and publishers of royalties and (2) radio stations and the listening public of the loyal service of disc jockeys and other employees. Since there was evidence from which a jury might find that the defendants, as members of a conspiracy, engaged in both the activities mentioned as well as in the use of the mails and the wires in furtherance of them, we conclude that the case must be remanded for a new trial which will be limited to those two activities alone, excluding the third activity originally alleged, namely, the defrauding of the United States by impeding the functions of the Internal Revenue Service.

In view of our conclusion that the judgments here appealed from which resulted from the appellants' trial cannot stand and that a new trial must be held, limited to the conspiracy count, we do not now consider those allegations of the appellants that relate to their claim to have been denied a fair trial. Those allegations are based, as we have hereinabove pointed out, on their assertion that the trial judge erred in certain of his instructions to the jury, in his failure to give certain other requested instructions and in certain of his rulings on the admissibility of evidence. At the retrial of the conspiracy count such of these questions as are then relevant to that more limited trial may be raised and will be further considered and passed on by the trial judge in the light of the setting in which they are then presented.

The conviction of appellant Tarnopol on Counts 3 through 7 and 12 through 28, the

conviction of appellant Garris on Counts 2, 4 through 7 and 12 through 28, and the convictions of appellants Wiegan and Shep on Counts 2 through 7 and 12 through 28 will be reversed. The conviction of all four appellants on Count 1 will be vacated and the cause remanded for a new trial on that count limited to the extent indicated in this opinion.