**UNITED STATES of America**

**v.**

**James C. LaBAR, et al.**

**Crim. Nos. 80–00130–01 to 80–00130–05.**

United States District Court,
M. D. Pennsylvania.

Aug. 14, 1981.

[redacted]

Gordon A. D. Zubrod, Asst. U. S. Atty., Scranton, Pa., for the U. S.

Ronald F. Kidd, Michael M. Mustokoff, Philadelphia, Pa., for James C. LaBar.

Jack B. Stevens, Alexandria, Va., for Donald J. Romanowski.

Barnet D. Skolnik, Washington, D. C., for Robert F. Conner and Petroleum Suppliers, Inc.

William W. Warren, Jr., Scranton, Pa., for LaBar Transp. Corp. and LaBar Enterprises, Inc.

## OPINION

MUIR, District Judge.

### I. Introduction.

On March 2, 1981, a jury convicted each of the Defendants of one count of conspiracy, 18 U.S.C. § 371, twenty-one counts of mail fraud, 18 U.S.C. § 1341, and two counts of making a false statement to a government agency, 18 U.S.C. § 1001. At

the close of the Government's case, the Court granted a motion by Petroleum Suppliers, Inc. for judgment of acquittal because the Government failed to prove that any of its officers or agents acted with an intent to benefit it. The Court also granted all the Defendants' motions for judgment of acquittal as to Count 25 because the Court determined that the letter on which that Count was based was not a false statement under 18 U.S.C. § 1001. Immediately upon the return of the jury's verdict the Court granted the Defendants' motion for judgment of acquittal as to the two false statement counts.

On March 17, 1981, timely motions for judgment of acquittal, a new trial, and in arrest of judgment were filed by the Defendants. On April 3, 1981, the individual defendants were sentenced to fines and suspended terms of imprisonment and fines were imposed on the two corporate defendants. Documents supporting the post trial motions were filed on April 21, 1981 and briefs in support of the motions were filed on May 1, 1981. The Government filed briefs in opposition to the motions on June 5, 1981 and the Defendants filed reply briefs on June 15, 1981. Both sides also submitted additional documents in support of their positions.

On June 4, 1981, the Defendants filed a motion seeking the production of two memoranda from the Government that the Defendants claim are material to their motion for judgment of acquittal. That motion was granted on June 30, 1981 and the parties were given until July 20, 1981 in which to file further briefs which they did. On June 15, 1981, new counsel entered the case for LaBar and further briefing was permitted, which concluded on July 21, 1981 when LaBar filed his last brief. All of the post-trial motions will be denied.

II. Motion for Judgment of Acquittal.

■ The first of nine grounds asserted in support of the motion for judgment of acquittal is that the Government failed to produce sufficient evidence to sustain the convictions. The Defendants recognize that in ruling on their motion for judgment of

acquittal the evidence must be viewed in the light most favorable to the Government, see United States v. Schmidt, 471 F.2d 385, 385–86 (3d Cir. 1972) (per curiam), and that all reasonable and logical inferences in support of the verdicts must be drawn from the evidence. See United States v. Trotter, 529 F.2d 806 (3d Cir. 1976). Utilizing that standard of review, the Court must determine whether the Government presented evidence to support a finding of guilt beyond a reasonable doubt.

Defendant LaBar Transportation Corporation was at the times relevant to the indictment one of the six largest mail hauling contractors in the United States. Among the multitude of statutory and regulatory provisions applicable to postal contractors is 39 U.S.C. § 5005(b)(1) which provides that the Postal Service with the consent of the holder of a transportation contract may adjust the compensation allowed under that contract "for increased . . . costs resulting from changed conditions occurring during the term of the contract." The Postal Service has promulgated at least two publications relating to this section. Section 19–316.21 of the Postal Contracting Manual, Government Exhibit 1.01, defines changed conditions as those over which the contractor has "little, if any control." The Postal Service's regional instructions, Government Exhibit 1.02, define changed conditions as those over which the contractor has "little or no control." If a contractor experienced fuel cost increases that met those definitions of changed conditions, and if the increases amounted to 3.5% of the amount previously approved, it could seek on a monthly basis so-called one line adjustments in its contracts to cover those costs. See Government Exhibit 1.02. It is these provisions that form the basis for the Government's prosecution of the Defendants.

It was the Government's contention at trial that the Defendants embarked upon a scheme to defraud the Postal Service by submitting to the Postal Service records of fuel purchases by LaBar Transportation that showed prices in excess of the prices

actually paid for the fuel. The Government sought to show that this scheme was executed in the following manner: The Defendants agreed in March 1977 to create a corporation to be called Petroleum Suppliers, Inc., whose sole function would be to purchase diesel fuel from suppliers who had been selling the fuel directly to LaBar Transportation. Petroleum Suppliers would then resell the fuel at increased prices to LaBar Transportation thereby providing LaBar Transportation with documentary evidence to support its requests for fuel price adjustments under its postal contracts. The Government further sought to prove that the Defendants actively misled the Postal Service as to the relationship between LaBar Transportation and Petroleum Suppliers.

The Defendants have never contended that Petroleum Suppliers was not created by them for the purpose of providing fuel to LaBar Transportation at a cost in excess of the costs LaBar Transportation had previously paid for fuel. They also do not dispute that they used the Petroleum Suppliers invoices to support their requests for fuel price adjustments. What they vehemently contest is that the Government's evidence proved beyond a reasonable doubt that the Defendants acted with an intent to defraud the Government or with an intent to disobey or disregard the law.

From the evidence produced at trial, the jury could reasonably have concluded that Petroleum Suppliers had no legitimate business purpose. The Government's evidence established that Petroleum Suppliers purchased fuel from the same suppliers that had previously sold fuel directly to LaBar Transportation and that it did so on credit terms no more favorable than those available to LaBar Transportation. The only new source of supply used by Petroleum Suppliers was a company in Florida to which Petroleum Suppliers turned after Colonial Oil, the company that had been selling fuel to LaBar Transportation, refused to sell to Petroleum Suppliers because in its view Petroleum Suppliers was not creditworthy. In all cases, fuel was delivered by the primary suppliers directly to LaBar Transpor-

tation's trucks or facilities. Petroleum Suppliers simply received the invoices and billed LaBar Transportation higher prices for the fuel.

Perhaps the most probative evidence of the lack of a legitimate business purpose of Petroleum Suppliers relates to the purchase of fuel with credit cards. Some of the LaBar Transportation drivers were issued credit cards by LaBar Truck Rental, Inc., a sister company to LaBar Transportation and both wholly owned by LaBar Enterprises, Inc. which was wholly owned by LaBar. When these drivers purchased fuel on the road, the purchases were charged using the credit cards and LaBar Truck Rental was billed. LaBar Truck Rental would then send the invoices to Petroleum Suppliers which would pay the invoices and bill LaBar Transportation a higher price for the fuel.

The Defendants, in their cross examination of the Government's witnesses and by certain documentary evidence introduced during the Government's case sought to convince the jury that Petroleum Suppliers had a legitimate business purpose. Among that evidence was testimony by Roger Crockford, Vice-President and General Manager of LaBar Transportation, that Defendant Conner was a "fuel professional" who was able to secure fuel when others could not do so. From this testimony, the Defendants argued that Petroleum Suppliers was a legitimate business because Conner's abilities were available if needed to secure fuel in the event of a recurrence of supply problems that had been experienced by LaBar Transportation in the years preceding 1977. The jury, however, was free to disregard this testimony coming as it did from an interested witness. The jury was also entitled to look at the other evidence in the case and reach the conclusion that Petroleum Suppliers did nothing more than mark up invoices.

From that conclusion, the jury was entitled to draw the further inference that the price increases charged by Petroleum Suppliers had no basis and were designed to

secure for LaBar Transportation increased compensation from the Postal Service. Since Petroleum Suppliers did nothing other than receive invoices from fuel oil companies, pay those invoices, and then invoice LaBar Transportation, it was reasonable for the jury to conclude that Petroleum Suppliers had no legitimate reason to charge LaBar Transportation prices in excess of what Petroleum Suppliers paid for the fuel. Since there is no question that Petroleum Suppliers did charge LaBar Transportation more for the fuel than Petroleum Suppliers paid for it, the jury was faced with the task of determining why it did so and why LaBar Transportation paid the invoices or dealt with Petroleum Suppliers at all.

There was evidence, Defendants' Exhibit 4, a letter written by Defendant Romanowski to the corporate attorney for the LaBar companies, that Conner was involved in the discussions with LaBar and Romanowski leading to the formation of Petroleum Suppliers. Defendants' Exhibit 4 also disclosed that the purpose of using Petroleum Suppliers was to increase fuel costs. LaBar Transportation was Petroleum Suppliers' only customer during the period covered by the indictment. In addition, it was Romanowski who directed the Petroleum Suppliers bookkeeper, who was employed by LaBar Enterprises, as to the fuel prices to be charged to LaBar Transportation. Defendants' Exhibit 4 disclosed that the Defendants intended management fees paid by Petroleum Suppliers to LaBar Enterprises and other miscellaneous expenses to offset Petroleum Suppliers's profits. Defendants' Exhibit 25 disclosed that during its first year of business Petroleum Suppliers paid in excess of $82,000 in management fees out of an operating income of approximately $124,000.00. Moreover, the evidence disclosed that all of the fuel suppliers continued to deal with Romanowski and that Conner was not involved in the procurement of fuel, with the exception of the one case in which a new supplier was needed when Colonial Oil refused to sell to Petroleum Suppliers. From this evidence the jury could conclude that prices charged by Petroleum Suppliers were determined with an eye toward how those prices would benefit LaBar Transportation and LaBar Enterprises in LaBar Transportation's dealings with the Postal Service rather than for any business purpose of Petroleum Suppliers.

Other evidence indicating control by LaBar Transportation over Petroleum Suppliers was the history of payments from LaBar Transportation to Petroleum Suppliers. Government Exhibit 79.01 showed a close correlation between the amount of cash paid by Petroleum Suppliers to its suppliers and the amount of cash paid by LaBar Transportation to Petroleum Suppliers. The Government argued from this evidence that LaBar Transportation's actual outlay of cash to Petroleum Suppliers was just sufficient to permit Petroleum Suppliers to pay its suppliers for fuel and that LaBar Transportation had no intention of ever paying Petroleum Suppliers its markup.

The Defendants argued to the jury that what in fact was occurring was the extension of credit from Petroleum Suppliers to LaBar Transportation and that the payment history between the companies showed that for the most part LaBar Transportation's payments were running anywhere from 60 to 105 days behind billings from Petroleum Suppliers. The jury could have rejected this argument because there was testimony that Petroleum Suppliers was obtaining its fuel on the same credit terms that LaBar Transportation had obtained it, namely, payment being required in 10 to 15 days and because Petroleum Suppliers did not appear to be in a financial position to extend credit to LaBar Transportation. Since LaBar Transportation was paying Petroleum Suppliers amounts that enabled Petroleum Suppliers to pay for its purchases of fuel and since those amounts were essentially equal to what LaBar Transportation had been paying for fuel prior to the creation of Petroleum Suppliers the jury could have reasonably concluded that the Government's interpretation of the payment history rather than the Defendants' was accurate.

The Court recognizes that this is not the only conclusion that the jury could have

drawn from the evidence. There was testimony from Roger Crockford and Daniel T. McHenry, the "Administrator" of LaBar Transportation, to the effect that price negotiations between Crockford and Conner occurred during the summer of 1978. While Crockford and McHenry both testified that such discussions occurred, they placed the discussions at different times of the year. More importantly, by letter dated June 26, 1978, McHenry represented to the Postal Service that LaBar Transportation was paying one price for fuel when in fact it had not paid that price for three months and was then paying less than represented in the letter. Because of these facts and because of these witnesses' obvious ties to the Defendants, the jury could have disbelieved their testimony about Conner setting the prices.

The evidence concerning the formation of Petroleum Suppliers, its purpose, method of operation, and the history of payments to Petroleum Suppliers were sufficient to support the inference that Conner did not set the prices that were charged LaBar Transportation and that no negotiations over prices occurred.

Based on the foregoing, the jury could have concluded beyond a reasonable doubt that the fuel prices charged by Petroleum Suppliers and the requests for fuel adjustments based on those charges were unjustified, that prices charged by Petroleum Suppliers to LaBar Transportation were determined by the Defendants for the benefit of LaBar Transportation, and that Petroleum Suppliers was controlled by LaBar Transportation and did not operate as a separate entity in its own interests. In short, the jury could reasonably have concluded that Petroleum Suppliers did nothing more than act as the nominal purchaser of diesel fuel, pay for that fuel with funds provided by LaBar Transportation for that purpose and bill LaBar Transportation for fuel at prices set at a level sufficiently high to permit LaBar Transportation immediately to seek increased compensation under its postal contracts. These conclusions alone, however, are not sufficient to support the convictions. The Government was also re-

quired to prove beyond a reasonable doubt that the Defendants acted with an intent to defraud the Government or with a bad purpose to disregard or disobey the law.

In its charge to the jury, the Court stated that intent can be inferred from the surrounding circumstances. Among those circumstances was evidence from which the jury could conclude that the entire procedure of increasing the price of diesel fuel by use of Petroleum Suppliers was nothing more than a series of paper transactions, the most blatant of which was the way in which the credit card sales were handled. In an attempt to rebut this inference, the Defendants attempted to bring before the jury advice they claimed to have received from the postal consultant, Travis Henry. One such attempt was Defendants' Exhibit 4, the letter from Romanowski to the attorney, in which it is stated that the decision to establish Petroleum Suppliers was reached after discussions with, among others, Travis Henry. In addition, the Defendants established on cross-examination of the Government's first witness that the Postal Service had no per se prohibition against the purchase of fuel from controlled or subsidiary corporations.

The obvious intent of this testimony was to convey to the jury that the seemingly unusual method of conducting business used by LaBar Transportation and Petroleum Suppliers was permitted by the Postal Service, or so the Defendants believed. Since the jury was never presented with the substance of the advice allegedly given by Travis Henry, it was not unreasonable for it to afford little weight to the attempt by the Defendants to rebut what was a rather strong inference of intent from the actions taken by the Defendants. There was, however, more evidence of unlawful intent.

The Defendants correctly argue that no Postal Service regulation in effect at the time covered by the indictment required disclosure to the Postal Service of the relationship between LaBar Transportation and Petroleum Suppliers or required any of the Defendants to advise the Postal Service

why Petroleum Suppliers was created or how it operated. The Defendants are also correct that there were only two written inquiries from the Postal Service to LaBar concerning these matters. One was a letter dated August 23, 1977, Government Exhibit 25.01, requesting "some explanation" of why LaBar Transportation was buying fuel for a route in Massachusetts from Petroleum Suppliers, a Pennsylvania company. The other was a letter also dated August 23, 1977 but from another postal official, Government Exhibit 4.01, relating that McHenry had not been able to explain why fuel was purchased from Petroleum Suppliers for a route in Massachusetts or if Petroleum Suppliers was a subsidiary of LaBar Transportation. LaBar replied by identical letters dated August 29, 1977, Government Exhibits 4 and 25 stating that the Pennsylvania company, Petroleum Suppliers, was a jobber and not a subsidiary. There were, however, other steps taken to convince the Postal Service that LaBar Transportation enjoyed no special relationship with Petroleum Suppliers.

On June 26 and July 19, 1978, McHenry, the "Administrator" for LaBar Transportation, wrote Postal Service officials in connection with fuel price adjustment requests. These letters, Government Exhibits 11 and 12, stated in essence that LaBar Transportation had been attempting to negotiate with Petroleum Suppliers for a reduction in fuel prices. As indicated above, because of the discrepancies in McHenry's and Crockford's testimony and the misrepresentation as to the price then being charged by Petroleum Suppliers, the jury could have reasonably concluded that no negotiations took place between LaBar Transportation and Petroleum Suppliers. The jury also could reasonably have concluded that the representations that they had taken place were made for the purpose of leading the Postal Service to believe that LaBar Transportation dealt with Petroleum Suppliers on an arms length basis and had no control over the prices charged LaBar Transportation by Petroleum Suppliers.

There was also evidence from which the jury could have concluded that the Defendants perceived a reason so to convince the Postal Service. Government Exhibit 8 is a letter written by LaBar to the Postal Service in which LaBar quotes a section of the postal manual relating to cost adjustments which recites that adjustments are limited to "increased . . . costs directly attributable to changed conditions. . . ." Changed conditions are defined as those brought about by external forces over which the contractor has "little if any control. . ." That letter is evidence that LaBar knew that increases were not allowable if the price changes were caused by the contractor. The Defendants, therefore, had a very good reason to attempt to convince the Postal Service that they had no control over the prices charged by Petroleum Suppliers.

The knowledge by the Defendants of the Postal Service's position that increased prices caused by the contractor were not subject to increased compensation undercuts the Defendants' position that they believed in good faith that they could obtain cost adjustments under the circumstances that could have been determined by the jury to have existed, namely, with the Defendants setting the prices charged by Petroleum Suppliers with the view toward the benefit to LaBar Transportation rather than toward any legitimate purpose of Petroleum Suppliers. It further undercuts the Defendants' position that they believed in good faith that they could set up Petroleum Suppliers to do nothing more than write invoices. While evidence to the effect that for a time Petroleum Suppliers and LaBar Transportation had the same mailing address, that both used bookkeeping services provided by LaBar Enterprises and that Petroleum Suppliers's books were not in any way hidden from employees was presented and argued to the jury as evidence that the Defendants lacked an intent to defraud, that evidence was not conclusive and did not offset the other evidence in the case showing unlawful intent.

Having determined that the Government presented sufficient evidence to warrant the jury in concluding that the scheme to defraud alleged in the indictment existed,

the Court must now determine whether the Government presented sufficient evidence to link any of the Defendants to that scheme. In order to sustain the convictions, the evidence must be sufficient to show that each defendant had knowledge of the illicit purpose of the scheme and took at least one step in furtherance of that scheme. Evidence of that knowledge must be clear, not equivocal. *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975).

Turning first to LaBar, Defendants' Exhibit 4, the letter of March 28, 1977 from defendant Romanowski to the attorney Marshall Jacobson, provides evidence that as of that date LaBar was involved in the decision to establish a fuel company through which LaBar Transportation would purchase its diesel fuel. As outlined in that letter, Petroleum Suppliers would be a subsidiary of LaBar Enterprises, which in turn was wholly owned by LaBar. The desirability to LaBar of Petroleum Suppliers being a subsidiary is evident from Romanowski's letter as well as from the testimony of Thomas Weir.

The jury could have inferred from the evidence that the purpose of forming a subsidiary fuel corporation was to insure that fuel price increases would exceed 3½% in a given 28 day certification period. The 3½% level was important because until fuel cost increases reached that amount, LaBar Transportation was not entitled to an immediate cost adjustment but would have to bear the increased costs for a period of 28 weeks at which time an adjustment could be requested. Testimony of Thomas Weir, General Manager, Surface Transportation Division, U.S. Postal Service, N.T. Vol. I, at 53, 73, 92. The use of a subsidiary, therefore, would enable the Defendants to reduce the time that LaBar Transportation would have to bear the increased costs of fuel. The use of a subsidiary had another advantage to LaBar.

Postal regulations provided that at most the increased fuel costs would be covered by Postal Service dollar for dollar. Weir testimony, N.T. Vol. I at 57. In other words, if on a given route LaBar Transportation experienced a 10¢ a gallon increase in fuel, the most the Postal Service would reimburse LaBar Transportation would be 10¢ a gallon. In that event, LaBar Transportation would not be making any more money on its postal contracts than if there had been no fuel price increase. Defendants' exhibit 4 reveals that the Defendants, including LaBar, hoped for an additional benefit by the use of a subsidiary company. The letter recites that "[m]aangement [sic] fees plus other miscellaneous expenses will offset [the subsidiary's] profits." From this the jury could have concluded that LaBar contemplated that in addition to receiving directly from the Postal Service increased compensation because of fuel cost increases, LaBar or one of his companies would receive additional compensation in the amount of management fees from the subsidiary. In that way, LaBar as sole owner of LaBar Enterprises which in turn was the sole owner of LaBar Transportation would in effect be earning more under the postal contracts than if fuel costs did not increase.

As recounted above, on August 23, 1977, two different officials of the Postal Service wrote to LaBar requesting information concerning Petroleum Suppliers. Government Exhibits 4.01 and 25.01. On August 25, 1977, two days later, Romanowski wrote to Marshall Jacobson to inform him that Petroleum Suppliers would not be owned by LaBar Enterprises and that Robert Conner would be the sole officer. Defendants' Exhibit 6. On August 29, 1977, LaBar sent the two identical letters, Government Exhibits 4 and 25, to the postal officials in which LaBar stated that Petroleum Suppliers was not a subsidiary and that it was being utilized as a fuel jobber to prevent reoccurrences of fuel shortages. On November 11, 1977 LaBar wrote a letter to the Postal Service, Government Exhibit 8, in which he set forth the portion of the Postal Service regulation that provides for cost increases only if they are due to circumstances over which the contractor has "little, if any control."

The jury could have inferred that when LaBar wrote Government Exhibits 4 and 25

he knew of the Postal Service's requirement that cost increases were not allowable if caused completely by the contractor. This inference is supported by the evidence of LaBar's participation in the decision to form Petroleum Suppliers in March 1977 and by the evidence of LaBar's knowledge of postal regulations disclosed by the November 11, 1977 letter to the Postal Service, Government Exhibit 8. The March 28, 1977 letter to Jacobson, Defendants' Exhibit 4, and Weir's testimony concerning fuel cost adjustments permitted the jury to infer that the use of Petroleum Suppliers would be most beneficial to LaBar if he could be assured that when prices were increased they were increased by more than 3½% at a time and if he could be assured that LaBar Enterprises would be receiving management fees. From this the jury also could have reasonably concluded that the decision to cause the ownership of Petroleum Suppliers to be by someone other than LaBar Enterprises was made to dilute the appearance that LaBar Transportation or LaBar Enterprises exercised control over Petroleum Suppliers, thereby increasing the chances that the Postal Service would approve the fuel cost adjustments.

The jury could infer that LaBar knew of the change in ownership of Petroleum Suppliers because as sole owner of LaBar Enterprises he had an interest in the disposition of a subsidiary that, according to its financial statement, Defendants' Exhibit 25, had a promising future. From these facts, the jury could reasonably have concluded that LaBar permitted the change because he believed it would have no practical effect on the relationship between LaBar Transportation and Petroleum Suppliers; specifically, that LaBar Transportation would be assured that fuel price increases would occur in steps of at least 3½% and that LaBar Enterprises would receive substantial management fees. This was a sufficient basis from which the jury could have reasonably concluded that LaBar was a knowing participant in the scheme proved by the Government.

LaBar's attempt in an affidavit attached to his reply brief filed July 21, 1981 to explain that although he signed Government Exhibits 4, 8, and 25 but did not prepare them is unavailing. The jury was certainly entitled to conclude from the fact that LaBar signed the letters that he wrote them and was aware of their contents. Those letters exhibit LaBar's knowledge of the contracting process and when taken in combination with the nominal divestiture of Petroleum Suppliers provide circumstantial evidence for the jury's conclusion that LaBar knowingly participated in the scheme.

The evidence with respect to Defendant Romanowski was also sufficient to support the convictions. Romanowski was involved in the day to day operations of both LaBar Transportation and Petroleum Suppliers. Testimony at trial revealed that it was he who supplied the LaBar Enterprises bookkeeper with the prices to be charged LaBar Transportation by Petroleum Suppliers. Romanowski also signed several of the fuel cost adjustment forms. The jury could also reasonably infer that Romanowski was aware of postal regulations regarding cost increases given his position with LaBar Transportation. The jury, therefore, could reasonably have concluded that Romanowski had knowledge that the scheme involved was unlawful and that he knowingly participated in it.

Defendant Conner's situation is similar to that of the defendant Smith in *United States v. Palmeri*, 630 F.2d 192 (3d Cir. 1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). That case involved a scheme to defraud by which certain union officials used their positions to cause union pension funds to buy certificates of deposits from certain banks in return for which the banks made available to the defendants or their nominees unsecured loans with no meaningful evaluations of the loan applications. *United States v. Palmeri*, 630 F.2d at 195. The defendant Smith was on the periphery of the conspiracy; he was a business agent of the union but did not have any control over the pension funds. His role in the scheme was to act as the nominal recipient of certain loans. In affirming his conviction, the Court of Ap-

peals held that Smith's receipt of loans together with his knowledge that he was acting as a nominee for one of the other defendants was sufficient to support the conclusion that he was a knowing participant in the scheme. *United States v. Palmeri,* 630 F.2d at 204–05.

In this case, the evidence was sufficient for the jury to have concluded that Conner was only the nominal owner of Petroleum Suppliers, that he acquiesced in that status and that he was willing to convey to the Postal Service that he was not a nominee but in fact ran Petroleum Suppliers. Since Defendants' Exhibit 4 showed that Conner was involved in the discussions relating to the formation of Petroleum Suppliers, the jury could have inferred that Conner knew that the success of the scheme depended on the Postal Service not learning that LaBar Transportation controlled Petroleum Suppliers. Government Exhibit 10 is a letter signed by Conner to the Postal Service in which Conner states that an invoice of Petroleum Suppliers was correctly billed to LaBar Transportation. The jury was entitled to conclude that in sending that letter Conner knew that it would help create the appearance that the invoice was evidence of a bona fide transaction between independent companies. The jury, therefore, was entitled to conclude that Conner was a knowing participant in the scheme.

LaBar Transportation argues that the Government failed to prove that any actions by its employees were taken with an intent to benefit the corporation and, consequently, the guilty verdicts against LaBar Transportation must be set aside. *See United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 205 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971). LaBar Transportation's argument is based on its contention that there could be no benefit to LaBar Transportation under the scheme alleged by the Government because the reimbursement from the Postal Service would never equal the total amount due Petroleum Suppliers for fuel. LaBar Transportation further argues that under the scheme alleged by the Government it was nothing more than "an instrumentality enabling the conspirators to funnel increased revenues to [Petroleum] Suppliers and any other company to which management fees were paid in excess of services rendered." Brief in Support of Motion of Defendants for Judgment of Acquittal at 42.

The Court rejects this argument as being unfounded. Fuel cost increases were sought on behalf of LaBar Transportation. From this the jury could reasonably have concluded that employees of LaBar Transportation processed the fuel adjustment requests with the intent that they be granted by the Postal Service for the benefit of LaBar Transportation. In addition, while the evidence of payments to Petroleum Suppliers by LaBar Transportation is susceptible of a construction that invoices were paid in full within a 60 to 105 day period, the jury could have concluded that at no time was there an intention on the part of LaBar Transportation to pay in full the ever mounting account due Petroleum Suppliers. Clearly, if the LaBar Transportation payable to Petroleum Suppliers was not intended to be paid, that would be a benefit to LaBar Transportation. Not only were Romanowski and LaBar shown to have been acting within the scope of their authority and in the course of their employment with an intent to benefit LaBar Transportation and LaBar Enterprises, the evidence was sufficient for the jury to have concluded that Daniel McHenry was so acting and that he knowingly misled the Postal Service when he wrote in Government Exhibits 11 and 12 that price negotiations had occurred between Petroleum Suppliers and LaBar Transportation. For these reasons, the Court concludes that the jury could reasonably have found beyond a reasonable doubt that employees of both corporations acted within the scope of their authority and with the intent to benefit the corporation. Consequently, neither corporate Defendant is entitled to a judgment of acquittal.

The Defendants assert in support of their motion for judgment of acquittal that they were the victims of selective prosecution.

This claim was raised before trial and denied by the Court without a hearing on the ground that the Defendants had failed to adduce credible evidence in support of their contention that others similarly situated were not prosecuted. *United States v. LaBar*, 506 F.Supp. 1267, 1272 (M.D.Pa.1981). In support of their post trial motion, the Defendants argue that the Court improperly made factual determinations without a hearing and that they had produced sufficient evidence to warrant a hearing on their claim. The Court rejects both contentions.

The Defendants argue that the Court improperly determined that there were significant differences between LaBar Transportation and other mail hauling contractors who the Defendants allege were similarly situated. It is the Defendants' position that the only characteristic that is relevant to this case is the purchase of fuel by a mail contractor from a subsidiary or controlled corporation. From this they argue that the Court's reliance on differences between the business operations of the other fuel companies and Petroleum Suppliers that were evident from the Defendants' submissions in support of their claim of selective prosecution was misplaced.

Despite the arguments by the Defendants, the Court remains unpersuaded that the sole factor to look at to see if others were similarly situated is whether the other mail contractors purchased fuel from subsidiary corporations. At no time has the Government taken the position that such activity is illegal. None of the evidence produced by the Defendants indicates that any of the other mail contractors used essentially paper corporations as vehicles to increase their fuel prices. The Defendants argue that because the Postal Service permitted a mark-up from these other subsidiary corporations to include profit as well as overhead, these subsidiary corporations are situated similarly to Petroleum Suppliers which the jury could have concluded had no overhead. In addition, Defendants have failed to produce any evidence that any of the other contractors who they claim are similarly situated affirmatively misrepresented the relationship between themselves and their fuel suppliers as the jury could have concluded was done in this case by way of McHenry's letters, Government Exhibits 11 and 12, representing that negotiations were occurring between LaBar Transportation and Petroleum Suppliers. Finally, the Defendants have failed to produce any evidence that other contractors submitted cost adjustment requests knowing they were not entitled thereto.

The conclusion that a hearing is not warranted on the selective prosecution claim is supported by the case of *United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979), in which the defendant Democratic county chairman argued that he was the victim of selective prosecution because officials of the Republican Party had engaged in similar conduct and were not prosecuted. The District Court denied the defendant's request for an evidentiary hearing and the Court of Appeals affirmed on the basis that even though payments by persons who contracted with the Pennsylvania Department of Transportation had been made to both Democrats and Republicans, the defendant failed to produce any evidence showing that the payments made to the Republicans were coerced. *United States v. Torquato*, 602 F.2d at 570 and n. 12. For that reason the defendant was not similarly situated to the Republican party officials. *United States v. Torquato*, 602 F.2d at 571. Similarly, the existence of contractors who purchased fuel from subsidiaries is not sufficient to warrant a hearing on the Defendants' claim of selective prosecution when the Defendants have produced no evidence that these other contractors manipulated the fuel supply companies as the Government alleged and proved the Defendants did in this case.

As the result of the Court's June 30, 1981 discovery order, the Defendants obtained from the Government two memoranda written by postal officials in February and March of 1978. The Court's conclusion that the Defendants are not entitled to a hearing on their claim of selection prosecution is not altered by those memoranda. Those communications show only that in considering requests for fuel price adjustments, a

major concern to the Postal Service was whether the price paid by the contractor was competitive. The memoranda show that LaBar Transportation and another contractor submitted requests for fuel cost adjustments that the local postal official thought were based on prices that were not competitive. The memoranda do not shed any light on the crucial issue of whether any other contractor sought fuel costs adjustments knowing that it had exercised complete control over the price it paid for fuel. The memoranda, therefore, do not constitute evidence that other contractors were similarly situated to the Defendants.

By letter dated July 8, 1981, LaBar Enterprises and LaBar Transportation raise an additional argument in support of their contention that the Defendants are the victims of selective prosecution. The argument is based on the following chronology. According to an affidavit submitted by LaBar, he met in Washington with Congressmen Jim Wright and Sam Hall on April 26, 1978 to request a G.A.O. investigation into postal contracting matters. On May 16, 1978, the two Congressmen made such a request in writing to the Comptroller General stating that they had received complaints "by contract highway mail haulers" that the Postal Service "may be putting improper pressure on mail contractors resulting in their being forced to carry mail at a loss, contrary to law." The final piece of evidence on this issue is that according to LaBar postal inspectors began their investigation in approximately August 1978. From this, the Defendants argue that they have presented sufficient evidence to warrant a hearing on their claim that Postal Service instituted its investigation of the Defendants in retaliation for the Defendants having asked two Congressmen to request the G.A.O. to investigate the Postal Service.

The problem with the Defendants' argument, however, is that they have failed to call to the Court's attention any competent evidence that the Postal Service was aware of LaBar's request to the Congressmen for an investigation, or that the Congressmen's letter was written because of LaBar's meeting or that the G.A.O. in fact began an investigation. In the absence of any evidence showing a causal link between the Congressmen's letter to the G.A.O. and the postal inspectors' decision to investigate the Defendants, the Defendants have failed to satisfy the threshold requirement for an evidentiary hearing on their claim.

The unique nature of fraud prosecutions requires careful scrutiny of selective prosecution claims. It is not uncommon for a fraudulent scheme closely to mirror a legitimate business operation. In fact, the more closely a fraudulent scheme resembles a legitimate one, the greater the chances of success to the schemers. These Defendants have been charged and convicted of defrauding the government by use of a scheme that involved apparently legitimate business dealings. To obtain a hearing on a claim of selective prosecution the Defendants must do more than come forward with evidence that others have legitimately used the same business forms in their dealings with the Postal Service. It bears note that unlike the usual selective prosecution claim in which the defendant argues that others who have committed the crime for which he is charged have not been prosecuted, these Defendants at no time have contended that the contractors who they claim are similarly situated violated the law. In short, the Defendants have to date produced evidence that shows nothing more than that other mail hauling contractors purchased fuel from subsidiaries. That showing is insufficient to require a hearing.

The Defendants also take issue with the Court's determination that the internal divisions of the Postal Service prevented any alleged animosity on the part of personnel in the mail processing department from infecting the postal inspection service's investigation into the Defendants' conduct. The Defendants do not dispute that such a division of functions exists, but argue that a hearing is required to determine whether in fact the separation of functions was observed in this case. This argument misconstrues the burden of the respective parties as to this issue.

In opposition to the Defendants' pre-trial motion raising the claim of selective prosecution, the Government submitted affidavits which showed that this investigation was handled routinely, that the decision to investigate was made by the postal inspection service and, more importantly, that the decision to seek a grand jury indictment was made solely by the United States Attorney. To date the Defendants have presented no evidence to contradict these assertions. In *United States v. Erne*, 576 F.2d 212, 216–17 (9th Cir. 1978), the Court of Appeals for the Ninth Circuit held that a separation of functions employed by the Internal Revenue Service similar to that used by the Postal Service was sufficient to remove any taint that might have existed in other branches of the service. Similarly in this case, even if the initial request for investigation to the Postal inspection service was motivated by improper reasons, the autonomy of the postal inspection service and of the United States Attorney uncontradicted by the Defendants, makes any taint immaterial.

For these reasons, the Court declines to hold an evidentiary hearing on the claim of selective prosecution and will not enter judgments of acquittal on the basis that the Defendants are victims of selective prosecution.

The Defendants argue that they are entitled to judgment of acquittal because their actions were reasonable under the Postal Service contracts and regulations and as such cannot form the basis for a prosecution to defraud the Government. The Defendants argue with respect to fuel price increases that all the contracts and postal regulations required was a certificate showing a statement of the names and locations of suppliers of fuel and the average price paid per gallon during the prior month. The Defendants contend that the certifications supplied with respect to purchases from Petroleum Suppliers met that requirement. In addition, the Defendants contend that when asked by Postal Service officials for "some explanation" of the request for adjustment, Government Exhibit 25.01, LaBar wrote explaining that LaBar Transpor-

tation was using a fuel jobber which was not a subsidiary. Government's Exhibit 25. In dismissing Count 25 of the indictment, the Court found as a matter of law that LaBar's letter was not a false statement within the meaning of 18 U.S.C. § 1001 because Petroleum Suppliers was not at the time of the letter a subsidiary. The Defendants argue from this that since they supplied a certification as required by the Postal Service and provided an explanation that was not a false statement they are entitled to acquittal on the remaining counts charging conspiracy and mail fraud.

This argument is based primarily on the case of *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980), which involved conspiracy as well as false statement charges. The opinion in that case, however, deals exclusively with the false statement charges and does not address the conspiracy charge. That case, therefore, is of limited value to a determination of whether conduct including statements that are not false statements under 18 U.S.C. § 1001 may properly form the basis for conspiracy and mail fraud convictions.

The Defendants' argument in this regard requires the Court to conclude as a matter of law that the fuel certifications submitted by LaBar Transportation were bona fide. There was, however, ample evidence from which the jury could have concluded that prices charged by Petroleum Suppliers were determined by LaBar Transportation, that such prices were never in fact paid by LaBar Transportation and for that reason the certifications were not bona fide. This case is not like the situation in *Race* in which the Court of Appeals held that the defendant's interpretation of the applicable contractual provisions was reasonable and for that reason the statements presented to the Government were not false. *United States v. Race*, 632 F.2d at 1119.

The Defendants support their argument that their interpretation of postal regulations was reasonable by relying on the two memoranda exchanged between the Jacksonville, Florida Transportation Manage-

ment Office (TMO) and the regional office of the logistic division of the Postal Service that the Defendants obtained as a result of the Court's June 30, 1981 discovery order. The Defendants argue that since the Jacksonville TMO was unsure as to how to process LaBar's request for a fuel increase, the Defendants cannot be prosecuted because they submitted fuel price increases in excess of the market price. The flaw in this argument is that it rests on the false premise that the Defendants were prosecuted for submitting fuel certifications showing that they purchased fuel for prices in excess of the market price. The Government's attempt to show that the prices certified by LaBar Transportation were in excess of the market price was precluded when the Court sustained the Defendants' objection to such evidence. The basis of the Government's charge against the Defendants is that contrary to Postal Service regulations, LaBar Transportation sought fuel price increases when it controlled those increases and that the Defendants caused LaBar Transportation to do so knowing that the conduct was in violation of applicable Postal Service regulations.

The Court rejects the Defendants' attempt to construe the two memoranda as establishing as the Postal Service's complete policy on cost increases the requirement that they be based on competitive prices. While the competitiveness of prices is one factor that the Postal Service considers when determining whether to permit fuel costs adjustment, it is not the only factor. Postal regulations clearly provide that cost increases are not available if they are brought about by circumstances within the contractor's complete control. The evidence presented in this case prevents the Court from concluding as a matter of law that the Defendants' conduct as it could have been found by the jury was a reasonable interpretation of postal regulations because that evidence supports the conclusion that LaBar Transportation exercised complete control over the prices charged by Petroleum Suppliers. Moreover, the Court cannot conclude as a matter of law that it was a reasonable interpretation of Postal

Service regulations for the Defendants to have concluded that they could cause Petroleum Suppliers to set its prices at levels high enough to permit LaBar Transportation to seek immediate cost adjustments from the Postal Service. Since the evidence did not permit the Court to conclude as a matter of law that the fuel adjustment requests complied with applicable regulations, the case properly was submitted to the jury and the jury could properly have rejected the Defendants' argument that the Defendants believed their conduct was permissible.

The Defendants next argue that they were affirmatively misled by the Postal Service into believing that their conduct was proper. They argue that there was a long-standing practice of the Postal Service authorizing mail haulers to purchase fuel from subsidiaries and that there was no regulation requiring disclosure of such purchases. Under this state of affairs, the Defendants argue they could not reasonably have expected that their actions would be grounds for prosecution. The Defendants rest this argument on the cases of *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), and *United States v. Insco*, 496 F.2d 204 (5th Cir. 1974). Neither those cases nor the evidence of record supports the Defendants' position.

As indicated above, the Defendants did not present any evidence as to what advice they received from Travis Henry or others concerning the legality of their plan. In *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. at 673–75, 93 S.Ct. at 1816–17, the case was remanded in order to give the defendant an opportunity to present evidence of its reasonable reliance on certain regulations promulgated by the Army Corps of Engineers. In this case, the Defendants were not prohibited from attempting to show reliance on Postal Service practice or expert advice; instead, they chose for tactical reasons not to present such evidence.

*United States v. Insco* involved a prosecution under 18 U.S.C. § 612 which requires

political candidates to affix attribution clauses to campaign materials. The defendant in that case was charged with failing to have done so with respect to bumper stickers. The indictment was dismissed on the ground that the statute was inartfully drawn and did not give fair warning that the conduct was illegal. This lack of fair warning was increased by the fact that there had been no prosecutions for the practice for 29 years and that the lack of attribution clauses on bumper stickers was "a universally accepted omissive practice among federal candidates." *United States v. Insco*, 496 F.2d at 209.

The conspiracy and mail fraud statutes involved in this case, however, are not subject to the same attacks. While the Defendants' reliance on advice and what they thought other contractors were doing would have been probative on the issue of good faith, no such evidence was offered. In addition, there was no evidence that the Postal Service affirmatively misled the Defendants into believing that they could engage in the conduct disclosed by the evidence which included the use of a shell corporation to generate marked up invoices and then affirmatively to mislead the Postal Service as to the relationship between LaBar Transportation and Petroleum Suppliers.

In their reply brief the Defendants request a hearing to show that their reliance on alleged Postal Services practices was reasonable and a ground to prevent their prosecution. A hearing at this stage of the proceedings is not appropriate. The Court rejects the Defendants' attempt to divorce this issue from those that were the proper subject of the jury's determination and to have the Court now hear their defense. Stripped to its core, the Defendants' argument is that they believed what they were doing was legal. Evidence on that issue could properly have been presented to the jury but the Defendants chose not to do so.

*United States v. Insco* is not to the contrary. While it is true that in *Insco* the Court of Appeals dismissed the indictment for the reasons stated above, it observed that the case involved "extraordinary facts, unlikely of repetition in other contexts...." *United States v. Insco*, 496 F.2d at 209. The Defendants have failed to show that this case presents factual circumstances so similar to *Insco* as to warrant the dismissal of the indictment.

The Defendants next argue that the convictions must be set aside because they are offensive to the due process clause of the Fifth Amendment since the regulations upon which the Government's case was based failed to give the Defendants fair warning of what was prohibited and placed unbridled discretion in the hands of law enforcement officials. It is the Defendants' position that the postal regulations involved in this case permitted fuel price increases only if they were attributable to external forces over which the contractor had "little, if any control." Postal Contracting Manual, § 19–316.21, Government Exhibit 1.01, or from "economic conditions" over which the contractor had "little or no control." Regional Instructions, Part 500 Transportation, 1008–T–164 Filing No. 523, Sept. 27, 1977, § IIB, Government Exhibit 1.02. It is the Defendants' contention that the Government's fraud theory is that the Defendants falsely and fraudulently represented to the Government that the fuel price increases were proper under postal regulations and that the increased prices were brought about by circumstances over which LaBar Transportation had "little, if any control" or "little or no control." Defendants argue from this that the phrases "little, if any control" and "little or no control" are too vague to provide the Defendants with notice of what degree of control over prices they could properly exercise.

The Government takes the position that even if the applicable postal regulations are vague, the Defendants can still properly be convicted of conspiracy and mail fraud because the elements of those offenses in the context of this case did not require proof that Postal Service regulations were violated. The Government's position is that the jury could have found that the Defendants

acted in a manner "reasonably calculated to deceive persons of ordinary intelligence and comprehension." *United States v. Pearl-stein,* 576 F.2d 531, 535 (3d Cir. 1978).

The Court finds the Government's attempt to divorce this prosecution from the postal regulations to be unpersuasive. The Court in its opinion denying the Defendants' pre-trial motion to dismiss the indictment on this ground stated at that time that the indictment charged conspiracy and mail fraud and did not charge the Defendants with violating Postal Service regulations. *United States v. LaBar,* 506 F.Supp. at 1274. At that time, the Court, of course, could not know the manner in which the Government would attempt to prove its case against the Defendants. Now that the trial has been completed, the Court agrees with the Defendants' contention that the phrases "little or no control" and "little, if any control" are crucial to the Government's case. The Government's entire theory of the case was that the Defendants sought fuel cost increases to which LaBar Transportation was not entitled under applicable regulations.

█ Having concluded that the postal regulations relating to price increases were crucial to the Government's case, the Court will confront the Defendant's vagueness argument. In a case such as this that involves no First Amendment freedoms, the Defendants' vagueness challenge must be determined in the light of the facts of the case. *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975). A statute regulating commercial activity is unconstitutionally vague if it "proscribes no comprehensible course of conduct at all." *United States v. Powell,* 423 U.S. at 92, 96 S.Ct. at 319.

Such a statute was in issue in *United States v. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921). That statute prohibited anyone from "willfully . . . make[ing] any unjust or unreasonable rate or charge in . . . dealing in or with any necessaries. . ." In explaining the Court's finding of unconstitutionality in the *Cohen* case, the Supreme Court in *Powell* explained that:

[t]he sugar dealer in *Cohen* . . . could have had no idea in advance what an "unreasonable rate" would be because that would have been determined by the vagaries of supply and demand, factors over which he had no control.

*United States v. Powell,* 423 U.S. at 92–93, 96 S.Ct. at 319–20.

In *Powell, Cohen* was contrasted to the case of *Sproles v. Binford,* 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167 (1932), in which a vagueness challenge to a statute providing that certain oversize loads must be transported by the "shortest practicable route" was rejected. In that case, the Court found that the carrier had been given "clear notice that a reasonably ascertainable standard of conduct [was] mandated; it [was] for him to insure that his actions [did] not fall outside the legal limits." *United States v. Powell,* 423 U.S. at 92, 96 S.Ct. at 319.

In *Powell* itself, the Supreme Court held that 18 U.S.C. § 1715, which proscribed the mailing of any "firearm capable of being concealed on the person", was not unconstitutionally vague when applied to a case involving the mailing of a 22-inch-long sawed off shotgun. *United States v. Powell,* 423 U.S. at 93, 96 S.Ct. at 320.

The Court concludes that regulations at issue in this case are closer to the statutes at issue in *Powell* and *Sproles* than they are to the statute condemned in *Cohen.* The regulations in issue fairly apprise postal contractors that they may not seek cost adjustments when their costs have been increased by their own actions. "While doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the [regulations] gave [the Defendants] adequate warning" that their attempt to seek fuel price adjustments under circumstances in which a jury could find beyond a reasonable doubt that they exercised complete control over those prices was unlawful. *See United States v. Powell,* 423 U.S. at 93, 96 S.Ct. at 320.

It bears emphasizing that at no time did the Defendants seek to argue to the jury

that they failed to understand the meaning of "little, if any control" or "little or no control." The Supreme Court has recognized that such misunderstandings are proper to bring before the jury in a case, such as this, that requires a knowing violation of the law. *See Bryson v. United States*, 396 U.S. 64, 69, 90 S.Ct. 355, 358, 24 L.Ed.2d 264 (1969). Further, the Defendants did not request of the Court an instruction to the jury as to the meaning of the phrases "little, if any control" or "little or no control." The requirement that the Government prove beyond a reasonable doubt that the Defendants acted knowingly also does much to undercut the Defendants' vagueness argument. *See Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 685 & n.13, 58 L.Ed.2d 596 (1979). For these reasons, the Court concludes that the postal regulations at issue fairly apprised these Defendants that the conduct they engaged in was unlawful and that their prosecution and conviction were not the result of unbridled prosecutorial discretion.

█ The Defendants, relying on *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), argue that the individual mailings alleged in counts 2 through 22 of the indictment were not sufficiently related to the alleged mail fraud scheme to support the mail fraud convictions. It is the Defendants' position that the mailing of the fuel cost adjustment forms and supporting documentation alleged in counts 2, 3, 5, 6, 7, and 9 were routine communications intrinsically innocent and required by law to have been made to the Postal Service. The Defendants do not address the other mailings alleged and proved in the case such as the letters relating to the fuel price increases alleged in Counts 4, 8, 10, 11 and 12 or any of the checks received by LaBar Transportation, the mailings of which are alleged in counts 13 through 22. The Court finds the Defendants' reliance on *Tarnopol* misplaced as to the fuel adjustment requests and certifications and finds the case inapplicable to the other mailings alleged and proved in this case.

*Tarnopol* involved a scheme to defraud whereby the defendants, record company executives, failed to record on the books of their companies the proceeds of certain cash sales of records and used the cash accumulated as a slush fund out of which to pay disc jockeys and radio program directors in order to induce them to play the companies' records. The records involved were actually produced by a third corporation which also filled orders for the records. Upon filling the orders, a copy of the packing slip was sent to the companies owned by the defendants. In the instances of sales for other than cash, the defendants routed the packing slips in the normal course to the bookkeeper who made the appropriate entries in the books. The packing slips generated by cash sales were retained by the Defendants, thereby preventing those sales from being recorded in the companies' books.

In holding that the mailings of the packing slips were not sufficiently related to the defendants' scheme to defraud, the Court of Appeals noted that the mailings were initiated by a third party, not the defendants, and that each mailing took place before the first action was taken to execute the fraud. *United States v. Tarnopol*, 561 F.2d at 473. In this case, however, the mailings of the fuel adjustment requests were initiated by the Defendants in their attempt to secure additional compensation from the Postal Service. Moreover, each mailing arose after the scheme to defraud had been put into operation. Finally, far from being only a convenience to the Defendants, as the Court of Appeals determined the use of the packing slips was to the defendants in *Tarnopol*, fuel certifications were an essential element in the Defendants' scheme in that they served as the basis for the increased compensation and the fact that the Postal Service required those forms in order to process the requests does not remove their mailing from the impact of the mail fraud statute.

The Defendants do not contend that the letters referred to in Counts 4, 8, 10, 11 and 12 were routine mailings required by the Postal Service. Each of those letters in

some way conveyed to the Postal Service the impression that LaBar Transportation was dealing with Petroleum Suppliers at arms length and that LaBar Transportation was indeed entitled to fuel cost adjustments it sought. These letters, therefore, could reasonably have been found by the jury to have been mailed in furtherance of the scheme to defraud.

The same observation applies with respect to the checks referred to in Counts 13 through 22. Each of those checks represented compensation including fuel price adjustments. It defies logic to argue that mailings by the victim to the Defendants of the proceeds of the scheme to defraud are not mailings in furtherance of that scheme.

■ The Defendants contend that they are entitled to acquittal because the opening statement delivered by the prosecutor failed to mention that the Government would prove that the venue for each crime lay in this district. The Defendants do not argue that the evidence was insufficient to support such a finding. They cite no case in support of their contention that in an opening statement the Government must tell the jury that it will prove each element of the crime. What case law there is on the subject is to the contrary.

The Courts have approved a procedure whereby a prosecutor waives his opening statement. *United States v. Holland*, 526 F.2d 284, 285 (5th Cir. 1976), and situations in which the prosecutor has failed to advise the jury that Florida law forms the underlying illegality that was allegedly promoted in a prosecution under the Travel Act, 18 U.S.C. § 1952. *Hanley v. United States*, 416 F.2d 1160, 1164 (5th Cir. 1969), *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). Moreover, there is no requirement that the prosecutor's opening statement include a recital of the evidence he intends to rely on or that he state a prima facie case in his opening. *United States v. Levine*, 372 F.2d 70, 73 (7th Cir.), *cert. denied*, 388 U.S. 916, 87 S.Ct. 2132, 18 L.Ed.2d 1359 (1967); *Chatman v. United States*, 557 F.2d 147, 149 (8th Cir.), *cert. denied*, 434 U.S. 863, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977). While it appears that the Court has the power to dismiss the indictment if the prosecutor's opening is insufficient, *Hanley v. United States*, 416 F.2d at 1164, the Court rejects the Defendants' contention that it is obliged to order their acquittal because of the Government's failure specifically to say in its opening that it would prove that venue is proper in this district.

■ The Defendants' final argument in support of their motion for judgment of acquittal is that since the fuel cost adjustment forms provided by the Postal Service state that failure to answer truthfully may give rise to prosecution under 18 U.S.C. § 1001, the Government is barred from prosecuting these defendants under the mail fraud statute. This claim was raised in the Defendants' pre-trial motion and rejected at that time by the Court, *United States v. LaBar*, 506 F.Supp. 1267, 1274–75 (M.D.Pa.1981), and the Court rejects it at this time for the same reasons.

### III. Motion for New Trial.

Having determined that the Defendants are not entitled to the entry of judgments of acquittal, the Court will now turn to their motion for a new trial. In support of that motion, the Defendants argue that the Court made three evidentiary errors, improperly prohibited the Defendants from using certain charts during closing argument and that the prosecutor's rebuttal argument was unfair and requires a new trial. The Court concludes that none of its rulings was erroneous, did not result in unfair prejudice to the Defendants, and does not require a new trial. In addition, the Court concludes that the prosecutor's closing remarks were proper and are not a ground for a new trial.

■ The Defendants argue that the admission of Government Exhibits 39 and 41 was improper under Fed.R.Evid. 403 because the probative value of those exhibits was substantially outweighed by the danger of unfair prejudice to the Defendants and that the prejudice suffered was such that a new trial is required.

Government Exhibits 39 and 41 are documents prepared by Colonial Fuel Oil Company in response to a letter and phone calls from Defendant Romanowski that his name be removed from invoices and that the invoices be sent to Petroleum Suppliers and not to LaBar Transportation. It was the Government's position that this evidence was relevant because it tended to show that Romanowski wanted to make it appear that he had no connection with Petroleum Suppliers. The reason for this wish, according to the Government, was the Defendants' awareness of the Postal Service's practice of investigating fuel cost increases resulting from purchases from a subsidiary or a controlled corporation more closely than other fuel adjustment requests. Part of this intensified scrutiny included checking with the companies who sold fuel to the contractor's supplier.

The Defendants argue that this evidence was cumulative because Government Exhibit 38, a letter written to Colonial Oil by Romanowski, instructs Colonial to "eliminate" Romanowski's name and Walter Nickelson, sales manager of Colonial Oil, testified at trial that Romanowski had told him to remove Romanowski's name from the invoices. The Defendants argue that the admission of Exhibits 39 and 41 was prejudicial because they contain the word "delete" which the Defendants argue has a more urgent connotation than the word "eliminate" used by Romanowski in his letter to Nickelson, Government Exhibit 38.

The Court does not view the admission of Exhibits 39 and 41 to have been "needless presentation of cumulative evidence", Fed. R.Evid. 403, but properly admissible to show that Colonial took steps to comply with Romanowski's request and that Romanowski made the request at least twice. In addition, the Court does not see any significant difference between the word "eliminate," used by Romanowski in Government Exhibit 38, and the word "delete" used by Colonial Oil and for that reason rejects the Defendants' claim that they were prejudiced by the admission of Government Exhibits 39 and 41. The admission of Govern-

ment's Exhibits 39 and 41 was not, therefore, error and not a ground for a new trial.

The Defendants' next argument with respect to the admission of evidence relates to testimony concerning Government Exhibit 11, a letter from Daniel T. McHenry to the Postal Service concerning a request for a fuel adjustment. That letter stated that LaBar Transportation had "task [sic] ourselves to negotiate with Petroleum Suppliers a reduction in rate..." and that LaBar Transportation was then paying 66.9¢ per gallon for fuel. The Defendants objected to the inquiry concerning the representation of the current price charged by Petroleum Suppliers on the ground that its probative value was substantially outweighed by its prejudicial impact and because it was not part of the scheme charged in the indictment. The Court, after reviewing the indictment and the bill of particulars filed by the Government, overruled the objections and permitted the testimony.

The Government's exhibit 11 can fairly be said to contain two alleged misrepresentations, the first relating to negotiations between LaBar Transportation and Petroleum Suppliers and the second relating to the then present price being paid by LaBar Transportation for fuel. It was the second representation that the Defendants objected to. Among other allegations, the indictment alleges on page 8, ¶ 2, that "the Defendants...did prepare and disseminate...by use of the mails, materially false and misleading information to the U.S. Postal Service...alleging that through the period from July 1, 1977 through December 31, 1978, LaBar Transportation Corporation was charged higher prices per gallon for diesel fuel to operate its Postal Service contracts than it actually was being charged." The Defendants were thereby put on notice that among the false representations allegedly made were ones relating to the amount actually being charged for fuel. Moreover, page 3 of the Government's bill of particulars states that "Government's Exhibits 11 and 12 are additionally false in that the so-called 'negotiations' were a sham because LaBar Transportation Corpo-

ration had not been billed by Petroleum Suppliers, Inc. at a rate of 66.9¢ per gallon since March of 1978 . . . ." The Court, therefore, was correct in its conclusion that a misrepresentation with respect to the then current price was alleged in the indictment and that the Defendants had adequate notice that the Government would attempt to prove such a misrepresentation. For that reason, the admission of the testimony relating to that aspect of Government Exhibit 11 was proper and not a ground for a new trial.

The Defendants also argue that the admission into evidence of Government Exhibit 79.01 was error requiring a new trial. That exhibit, a portion of which is reproduced below, was a schedule showing the amount paid to primary suppliers by Petroleum Suppliers, the amount billed to LaBar Transportation by Petroleum Suppliers, and the amount paid to Petroleum Suppliers by LaBar Transportation Corporation.

Comparison of invoices to cash flow between primary suppliers, Petroleum Suppliers, Inc. (PSI) and LaBar Transportation Co.

| Check Issue Date PSI | Number of checks and check nos. PSI | | Amount Paid to Primary Suppliers by PSI | Amount Billed to LTC by PSI | Date of LTC check to PSI | Amount Paid to PSI by LTC | LTC check Number |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 081177 | 3, | 101–103 | $ 51,765.61 | $ 54,769.57 | | | |
| | | | | | 8/16/77 | $40,000.00 | 8556 |
| | | | | | 8/17/77 | 12,000.00 | 8564 |
| 083177 | 1, | 104 | 11,151.56 | 11,816.06 | | | |
| | | | | | 8/31/77 | 11,500.00 | 8633 |
| 090977 | 3, | 105–107 | 35,938.42 | 37,946.55 | | | |
| | | | | | 9/12/77 | 36,000.00 | 8719 |
| 100677 | 3, | 108–110 | 48,967.10 | 55,555.22 | | | |
| | | | | | 10/06/77 | 49,000.00 | 8891 |
| 101177 | 1, | 111 | 93.07 | | | | |
| 110377 | 4, | 112–115 | 48,898.80 | 55,604.26 | | | |
| 110477 | 1, | 116 | 10,020.42 | 13,860.58 | | | |
| | | | | | 11/07/77 | 60,000.00 | 9130 |
| 113077 | 6, | 117–122 | 59,596.31 | 67,439.49 | | | |
| | | | | | 12/05/77 | 60,000.00 | 9452 |
| 120577 | 1, | 123 | 46,004.19 | 48,328.15 | 12/05/77 | 46,004.19 | 9453 |
| 122977 | 8, | 124–131 | 75,772.44 | 89,771.60 | | | |
| 123977 | 1, | 132 | 40,063.83 | 47,947.54 | | | |
| | | | | | 12/31/77 | 50,000.00 | 9581 |
| | | | | | 01/04/78 | 65,000.00 | 9582 |
| 012578 | 6, | 133–138 | 56,129.81 | 66,656.32 | | | |
| 013078 | 4, | 139–142 | 82,824.49 | 114,037.58 | 01/30/78 | 70,000.00 | 9721 |
| | | | | | 01/31/78 | 70,000.00 | 9749 |
| 022278 | 12, | 143–155 * | 123,188.84 | 150,740.24 | | | |
| | | | | | 02/27/78 | 90,000.00 | 10102 |

The Government had initially sought the admission of an exhibit 79 which was identical to 79.01 except that it had a ninth column which showed the difference between the amount billed to LaBar Transportation by Petroleum Suppliers and the amount paid by LaBar Transportation to Petroleum Suppliers. The Court excluded that exhibit on the ground that the ninth column was argumentative in that it set forth the Government's position as to the nature of the relationship between the companies, namely that LaBar Transportation paid only enough cash to Petroleum Suppliers to enable Petroleum Suppliers to meet its cash requirements.

The Defendants argued at trial and renew their argument now that Exhibit 79.01 was inaccurate because it shows both cash flow and accounts receivable of Petroleum Suppliers without showing LaBar Transportation's account payable to Petroleum Suppliers and without showing LaBar Transportation Corporation's account receivable from the Postal Service. Thus, according to the Defendants and their expert witness, the schedule failed to give an accurate pic-

ture of the business relationship of the companies.

Fed.R.Evid. 1006 permits a summary of voluminous writings which cannot conveniently be examined in court. Government Exhibit 79.01 accurately sets forth the information on which it was based. Moreover, contrary to the Defendants' contentions, it is not unfairly presented. By itself, this schedule shows the dates on which payments were made by Petroleum Suppliers, bills were submitted to LaBar Transportation Corporation, and the dates and amounts of payments by LaBar Transportation Corporation to Petroleum Suppliers. It was proper argument on the part of the Government to suggest to the jury that what was revealed by these transactions were payments from LaBar Transportation to Petroleum Suppliers in amounts just sufficient to permit Petroleum Suppliers to pay its suppliers. The schedule also accurately reflected the Defendants' contention that the history of payments demonstrated an extension of credit of Petroleum Suppliers to LaBar Transportation. The Court, therefore, cannot conclude that the probative value of the chart, which summarized voluminous records, was substantially outweighed by the prejudice to the Defendants.

The Court's conclusion that Exhibit 79.01 was properly admitted is not effected by the fact that two jurors performed calculations indicating that by the end of 1978 LaBar Transportation owed Petroleum Suppliers in excess of $200,000 or that the prosecutor made the same argument to the jury. The Defendants do not dispute that such is the case; rather, they argue that it was not proper for the jury to be able to discover that fact by the use of Exhibit 79.01 or for the Government to argue from that fact that LaBar Transportation controlled Petroleum Suppliers. The Defendants ably argued their position that the history of payments was consistent with an extension of credit to LaBar Transportation by Petroleum Suppliers. The jury was free to reject that inference and adopt the Government's inference, particularly in light of the facts that Petroleum Suppliers

was obtaining its oil on terms requiring payment within 10 days, that it had no other customer, and that it was thinly capitalized. The jury could properly have concluded that Petroleum Suppliers was not in a position to extend credit to LaBar Transportation and that there was no intention on the part of any of the Defendants that the growing account receivable would ever be satisfied. For these reasons, admission of Government Exhibit 79.01 was proper and not a ground for a new trial.

■ The Defendants argue they are entitled to a new trial because the Court prevented them from using 10 charts in their closing to the jury. Those charts were shown to the Government and the Court only several minutes before the defense was to use them. Although defense counsel represented that the information contained in the charts was a summary of that previously provided the Government, a representation that the Government now concedes was accurate, the Defendants proposed to use the charts without giving the Government or the Court an opportunity to determine whether they were accurate or representative of the evidence in the case. The Court offered the Defendants a recess and hearing to determine whether the charts were an accurate reflection of the evidence, N.T. Vol. VII at 109, and the Court stated that defense counsel could present pictorially any evidence which they could demonstrate was in the record. Both proposals were rejected by defense counsel. N.T.Vol. VII at 109, 112.

The charts were not permitted to be used in the Defendants' closings because neither the Court nor Government counsel had an opportunity to determine whether they were within the bounds of proper argument. Just as one counsel has a right to object to statements made by opposing counsel in a closing argument because they are clearly unsupported by the facts in the case, it was a reasonable exercise of this Court's discretion to require the Defendants to give the Government the opportunity to determine whether to object or to prepare

arguments in opposition to those contained in the charts. The cases cited by the Defendants are not to the contrary.

In *United States v. Parenti*, 326 F.Supp. 717, 728–29 (E.D.Pa.1971), *aff'd* 470 F.2d 1175 (3d Cir. 1972) (per curiam), *cert. denied*, 411 U.S. 965, 93 S.Ct. 2145, 36 L.Ed.2d 686 (1973), the summary charts had been explained in detail by a Government witness during the trial, and both sides had ample opportunity to study the charts. Similarly, in *United States v. Goichman*, 407 F.Supp. 980, 998–99 (E.D.Pa.), *aff'd* 547 F.2d 778 (3d Cir. 1976) (per curiam), the charts were permitted because witnesses had established the basis for their use and the charts were cross-referenced to exhibits that had been received in evidence. The Court had an obligation to insure that the charts were not confusing, misleading, grossly inaccurate, or completely irrelevant. *See United States v. Altruda*, 224 F.2d 935, 938–39, 942 (2d Cir. 1955). It was, therefore, a reasonable exercise of this Court's discretion to prohibit the use of the charts under the circumstances as they then existed.

Defendants have also failed to show how they were prejudiced by the Court's refusal to permit the use of the charts. The first five charts would have been used to show that payments from the Postal Service to LaBar Transportation were generally unchanged during the period covered by the indictment. The last five charts would have been used to demonstrate the prices billed by Petroleum Suppliers to LaBar Transportation and requested from the Postal Service were merely the beginning point in a process of negotiation, that the Postal Service routinely paid substantially less to LaBar Transportation than it had requested and that the payments were less than the amounts being paid by LaBar Transportation to Petroleum Suppliers.

The Court fails to see how the first group of charts is relevant because it is not probative of any issue in the case whether the Defendants succeeded in their attempt to obtain more compensation than that to which they were entitled. As to the second group of charts, at no point during the trial did the Defendants seek to base a defense on the proposition that it was permissible to seek compensation in excess of that to which they were entitled because negotiations would inevitably follow and result in a payment of a lower and presumably correct amount. Having been rebuffed in their attempt to use the argument charts, the Defendants failed even to attempt to argue these propositions to the jury. The Court, therefore, cannot determine how that argument may have been adversely affected by the lack of the charts. Consequently, Defendants cannot now seek a new trial on the ground that the charts were improperly excluded.

■ The Defendants' final argument in support of their motion for a new trial is that the prosecutor in rebuttal argument improperly argued and implied to the jury that defense counsel were deliberately seeking to avoid the facts of the case. In rebuttal, the Assistant United States Attorney stated:

> [Defense lawyers'] statements are interesting for what they say and they are equally interesting for what they did not say. And this is my recollection: I did not hear anything on how the negotiations in June and July of 1978 could have taken place when there was nothing to negotiate. Was there any attempt to explain that? It appears to me that the defense lawyers avoided the question of the August 9th mailings.... It appeared to me that they avoided much of the discussions of the primary suppliers. (N.T.Vol. VII, 191–2).

Although the Defendants objected to this remark at the conclusion of the argument, they did not do so contemporaneously and did not seek a mistrial or a curative instruction. Although the Court could perhaps properly decline to consider the contention further because of the Defendants' failure to seek a mistrial or a curative instruction the Court will not do so because in its view there is nothing improper about the prosecutor's remarks.

In his closing argument, Mr. Skolnik accused Government counsel of "tossing and juggling and shuffling and twisting" the facts of the case to produce a crime. N.T. Vol. VII at 142. He also stated that the Defendants were being prosecuted because the Government did not like the way they did business, N.T.Vol. VII. at 168–70 and in addition accused Government counsel of distorting the evidence. N.T.Vol. VII at 154. It is the Court's view that Government counsel's remarks, which merely pointed out to the jury that for all their passion defense counsel failed to address certain key factual issues in the case, were entirely proper and showed restraint in light of the tone of some of the defense counsels' closings.

Based on the foregoing, the Court concludes that the Defendants are not entitled to a new trial.

## IV. Motion in Arrest of Judgment.

The Defendants' motion in arrest of judgment contends that the indictment fails to allege an offense because a scheme to defraud the Government is not prohibited by 18 U.S.C. § 1341, and because crimes involving false claims and false statements to the Government must be prosecuted under 18 U.S.C. §§ 287 and 1001. The Defendants also contend that the indictment fails sufficiently to notify them of the nature of the charges and is not a plain, concise statement of essential facts as required by Fed. R.Crim.P. 7(c)(1) and that the indictment fails to allege an offense by the corporate defendants because it does not charge that the actions of their employees were within the scope of their authority and in the course of employment. The Defendants also contend that the Court was without jurisdiction because venue does not lie in the Williamsport division of the Middle District of Pennsylvania. None of these contentions has any merit. All of the arguments on behalf of the individual defendants, with the exception of the venue argument, were raised in the Defendants' pretrial motion to dismiss and rejected by the Court in its denial of that motion, *United States v. LaBar*, 506 F.Supp. 1267, 1274, 1277 (M.D.Pa.1981), and the Defendants have not convinced the Court that its earlier decision was erroneous.

 The argument on behalf of the corporate defendants was raised prior to trial and rejected in an unreported order filed January 21, 1981. As the Court there stated, an indictment sufficiently alleges an offense against a corporation if it either alleges that the corporation acted knowingly or absent such an allegation sets forth facts showing a knowing violation, namely an act done by a corporate agent within the scope of his authority and with the intent to benefit the corporation. *See United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 205 (3d Cir. 1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971); *Standard Oil Company of Texas v. United States*, 307 F.2d 120, 130 (5th Cir. 1962). The indictment in this case alleges that the defendant corporations acted knowingly. In addition, the acts of the individual officers and agents of the Defendant corporations are set forth in the indictment. For these reasons, the Court concludes that the indictment adequately alleges offenses by the corporation defendants.

 In their reply brief the Defendants have intensified the attack on the Government's use of the mail fraud statute to punish what the Defendants claim are crimes already punishable under the false claims act, 18 U.S.C. § 287 or the false statements act, 18 U.S.C. § 1001. For this reason, the Court will address this claim more fully than in its earlier opinion.

The Defendants rest their argument that the indictment fails to allege an offense under 18 U.S.C. § 1341 on the Supreme Court's decisions in *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), and *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), and on an opinion by the United States District Court for the Eastern District of Virginia in *United States v. Computer Sciences Corporation*, 511 F.Supp. 1125 (1981), which in turn relied on *Busic* and *Simpson*. Because this Court concludes that *Busic* and *Simpson* involved issues not applicable to this case, it rejects the Defendants' position.

*Busic* and *Simpson* required the Supreme Court to determine the relationship between 18 U.S.C. § 924(c), a statute that provides for increased penalties for the use of firearms during the commission of a federal felony, and two other sections of the United States Code that contained their own provisions for enhanced punishment in the event firearms or dangerous weapons were used. In *Simpson*, the other statute was 18 U.S.C. § 2113(d), which concerns bank robberies while in *Busic* the other statute was 18 U.S.C. § 111, which prohibits assaults on federal officers. In both cases the defendants were convicted of using firearms in the commission of the federal felonies. Busic received an enhanced punishment under § 111 and an additional sentence under § 924(c). Simpson received an enhanced punishment under § 2113(d) as well as an additional sentence under § 924(c). In *Simpson* the Supreme Court held that as a matter of statutory construction only one enhanced penalty could be provided and held in *Busic* that the enhancement was governed by the section creating the underlying felony rather than the general enhancement provision of § 924(c). The Court did so on the basis of congressional intent in enacting § 924(c) as well as principles of statutory construction requiring that ambiguity in criminal statutes be resolved in favor of lenity and the principle that the more specific statute be given precedence over a more general one. *Busic v. United States*, 446 U.S. at 406, 100 S.Ct. at 1753.

The Court in *Computer Sciences* used this analysis to dismiss mail and wire fraud charges asserted against the defendants when the same conduct, absent the requirement of mailing, would constitute offenses under either 18 U.S.C. § 287 or § 1001. The Court held as a matter of statutory construction that the more general mail fraud statute had been supplanted insofar as fraudulent claims against the United States were concerned by the false claims act, 18 U.S.C. § 287, and the false statements act, 18 U.S.C. § 1001. The additional element of mailing was not sufficient to permit the Government to prosecute under the mail

fraud statute because Treasury Department regulations required that the mails be used to send checks to claimants.

What the Defendants' reliance on *Busic* and *Simpson* ignores is the crucial fact that in both cases identical conduct was subject to enhancement under two different statutes. In this case, however, although the defendants seek to trivialize it, the Government was required to prove the use of the mails in furtherance of the scheme to defraud. It is not unreasonable to ascribe to Congress an intent to punish more severely frauds involving use of the mails than other false claims on or false statements to the Government. Moreover, the Defendants have pointed to no legislative history that shows that Congress was concerned of potential overlap of the mail fraud statute and either the false claims act or the false statements act at the time each was passed or that Congress intended to forbid the use of the mail fraud statute when false claims were mailed to the Government as part of a scheme to defraud. *See United States v. Weatherspoon*, 581 F.2d 595, 599 (7th Cir. 1978). Such cognizance on the part of Congress played a large part in the Supreme Court's determination of legislative intent in *Busic* and *Simpson*. Finally, the Government proved more than that the Defendants submitted false claims to the Postal Service. It proved the Defendants embarked on a scheme actively to conceal from the Postal Service the falsity of the claims.

Because the conduct for which the Defendants have been convicted is not identical to conduct punishable under either 18 U.S.C. § 287 or § 1001 and because the legislative history surrounding the statutes in question does not show a congressional intent to forbid prosecution under the mail fraud statute, the Court finds the Defendants' arguments based on *Busic* and *Simpson* to be unpersuasive as it does the *Computer Sciences* case also relied on by the Defendants.

█ The Defendants' attack on the venue of the Court is similar to one raised before trial seeking to transfer the trial to

Scranton and rejected by the Court in an unreported order of January 29, 1981. The Defendants cite no case in support of their contention that venue for constitutional purposes requires that they be tried in any given division of a district or that the petit jury be drawn from the same geographical division as was the grand jury. This district has no divisions. It is undisputed that the acts giving rise to the indictment took place within the Middle District of Pennsylvania and the trial of that indictment in any part of the District was constitutional. *See Zicarelli v. Gray,* 543 F.2d 466, 479 (3d Cir. 1976), *United States v. Joyner,* 494 F.2d 501, 504–05 (5th Cir.), *cert. denied,* 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 268 (1974); *Jeffers v. United States,* 451 F.Supp. 1338, 1347 (N.D.Ind.1978).

Since the Court concludes that the Court had jurisdiction to try the case and that the indictment charged offenses, the motion in arrest of judgment will be denied.

On July 23, 1981, Defendants filed a motion for a new trial. The motion was supported by a brief filed August 3, 1981. As of this time, no brief in opposition to the motion has been filed, nor is one due before August 21, 1981. Accordingly, the motion is not ripe for disposition and will not be addressed at this time.

An appropriate order will be entered.

### ORDER

1. The Defendants' motion for judgments of acquittal is denied.

2. The Defendants' motion for a new trial is denied.

3. The Defendants' motion in arrest of judgment is denied.